**PITTSBURGH CORNING CORPORATION,**
Appellant,

v.

**Cecile J. WALTERS, Individually and as personal representative of the Heirs and Estate of Douglas F. Walters, Deceased, Appellee.**

No. 13–97–753–CV.

Court of Appeals of Texas,
Corpus Christi.

Aug. 5, 1999.

Julie Caruthers Parsley, Thompson & Knight, Austin, George Lucas Ashley, Thompson & Knight, Dallas, William D. Harvard, Blasingame, Burch, Garrard, Bryant & Ashley, Athens, GA, Raymond

Lyn Stevens, Stevens & Baldo, Beaumont, for appellant.

Janice Pennington, Misty Ann Farris, Brent M. Rosenthal, Baron & Budd, Dallas, for appellees.

Before Chief Justice SEERDEN and Justices YAÑEZ and CHAVEZ.

## OPINION

Opinion by Chief Justice ROBERT J. SEERDEN.

This is a products liability and negligence case tried before a jury. Pittsburgh Corning Corporation ("PCC"), appellant, appeals the adverse judgment for damages under the Texas Wrongful Death and Survival Statute.

In seven issues, PCC asserts that: (1) the trial court lacked subject matter jurisdiction over this suit because Cecile Walters lacked standing to bring this claim in Texas under the Texas survival statutes; (2) the trial court erroneously applied Texas substantive law to this case; (3) the trial court erroneously admitted harmful hearsay evidence in the form of a staged and edited videotape of the decedent; (4) the trial court erroneously admitted unqualified and unreliable expert testimony; (5) the trial court erroneously admitted documents that were irrelevant and unfairly prejudicial; (6) the evidence presented is legally and factually insufficient to support a finding of liability; and (7) the evidence presented is legally and factually insufficient to support the jury's damages findings and awards. We affirm.

### Factual Summary

Douglas F. Walters was a California resident. In the 1960's, Walters enlisted in the Navy. During his tour of duty, Walters was responsible for some degree of oversight in the process of constructing nuclear submarines. Such construction was done in both California and Virginia. At the time, the Navy used Unibestos, a product manufactured by PCC, in the construction

process. As a result, Walters was exposed to Unibestos which contained asbestos. After his Naval career ended in 1971, Walters returned to California. In 1994, Walters sought medical attention for sharp chest pains. A doctor diagnosed Walters with mesothelioma, a cancer caused by asbestos exposure. Walters died in La Mesa, California on August 15, 1994.

On August 5, 1994, Walters and his wife Cecile filed a personal injury action in the 28th District Court of Nueces County, Texas against PCC and twenty-one other defendants seeking damages for Walters' exposure to Unibestos. After Walters' death, his wife, also a California resident, pursued the suit under the Texas survivor statute. See TEX. CIV. PRAC. & REM.CODE ANN. §§ 71.021 & 71.031 (Vernon 1994). By the time of trial, the only remaining defendant in this action was PCC, a corporation with its principal place of business in Pennsylvania. After hearing pre-trial motions, the trial court determined that Texas substantive law would apply to the case.

During the course of the trial, the court permitted Walters to introduce a four-and-a-half-minute videotape with statements from the victim, made approximately four days before his death. In the audio portions, the decedent discussed his overall condition. The parties dispute the underlying nature of the videotape. Both sides admit that the videotape presented at trial was an edited version of a one-and-a-half-hour tape in which counsel asked Walters many questions. PCC claims that the statements contained in the videotape are made in response to expurgated questions from counsel. The court nevertheless admitted the videotape.

Walters also introduced the expert testimony of four individuals who stated unequivocally that asbestos and products containing asbestos cause disease when released into the air. All four experts are medical doctors. One of the four also conducted an extensive review of contemporaneous literature available at or near the time of Walters' exposure. After reviewing Walters' records, the experts concluded that asbestos exposure had caused Walters' death. Each of the four concluded that Unibestos was a dangerous product. Moreover, the experts testified that PCC was negligent and grossly negligent. The court also admitted three exhibits which supported the experts' conclusion that asbestos-based products are dangerous and likely to cause disease in those who are exposed to them.

The jury found PCC liable for negligence and gross negligence based on its production of an unreasonably dangerous product without sufficient warnings. Based on this verdict, the jury returned damages awards in favor of the estate of Douglas Walters, his wife, and his parents. The total of this award, without interest, is approximately $8.8 million.

## Standing and Jurisdiction

By its first issue, PCC argues that the Texas wrongful death and survival statutes do not give standing to non-residents suing for an out-of-state death, and therefore, the trial court erred in asserting subject matter jurisdiction over this case.

The wrongful death cause of action in Texas is a purely statutory creation. See generally TEX. CIV. PRAC. & REM.CODE ANN. § 71.001 et seq. (Vernon 1997). An individual may bring "an action for actual damages arising from an injury that causes an individual's death" if a basis for liability exists. TEX. CIV. PRAC. & REM.CODE ANN. § 71.002 (Vernon 1997). An individual may pursue a wrongful death claim even though the injury giving rise to the action occurred in a foreign state. TEX. CIV. PRAC. & REM.CODE ANN. § 71.031 (Vernon 1997). Finally, a wrongful death action survives the individual "to and in favor of the heirs, legal representatives, and estate of the injured person." TEX. CIV. PRAC. & REM. CODE ANN. § 71.021(a) & (b) (Vernon 1997). PCC claims that because none of the actions occurred in Texas and none of the

parties are Texas residents, Walters lacked standing to bring this action in Texas.

▮ The record does reflect that the Unibestos product was produced in Tyler, Texas in the early 1960's, a time which approximately corresponds with Walters' exposure to the asbestos fibers.[1] Furthermore, the record indicates that PCC did not make a special appearance, but did, however, file a motion to transfer venue, which the trial court denied. PCC does not contest that ruling. Thus, any objections to personal jurisdiction or venue have been waived. *See* TEX.R. CIV. P. 120a(1).

Regardless, the concept of standing is fundamental. A contest to standing is never waived and there is never a presumption that standing exists. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex.1993).

The issue of non-resident standing to bring a statutory wrongful death claim in Texas for injuries occurring outside of the State appears to be one of first impression. Clearly, a Texas resident may bring suit in this state for a death occurring elsewhere. *See Total Oilfield Servs., Inc. v. Garcia,* 711 S.W.2d 237, 238–39 (Tex.1986). Other cases have been resolved with only a tacit discussion of non-resident standing. *See Dow Chem. Co. v. Castro Alfaro,* 786 S.W.2d 674, 679 (Tex.1990) (discussing only the doctrine of *forum non conveniens* in a suit with similar facts). In the most similar case to the instant dispute, the El Paso Court of Civil Appeals suggested in a personal injury case that the statutory predecessor to section 71.031 "opens the courts of this state to citizens of a neighboring state and gives them an *absolute right* to

maintain a transitory action of the present nature and to try their cases in the courts of this state." *Allen v. Bass,* 47 S.W.2d 426, 427 (Tex.Civ.App.—El Paso 1932, writ ref'd) (emphasis added). The Texas Supreme Court accepted this construction of section 71.031. *See Alfaro,* 786 S.W.2d at 679 (stating that the court's refusal of the application for writ of error manifests its approval of the decision of the appellate court).

In *Alfaro,* the court was faced with relatively similar facts. A foreign plaintiff brought a cause of action in Texas for injuries he sustained in Costa Rica. *Id.* at 681 (Doggett, J., concurring). He was working on a plantation owned by a Florida corporation. *Id.* He was injured by pesticides supplied by Shell Oil Company, headquartered in Houston, and Dow Chemical, a Michigan corporation conducting extensive operations in Texas including the manufacture of chemicals in Freeport. *Id.* Alfaro sued Dow and Shell in Harris County in April of 1984, alleging that the court had jurisdiction pursuant to article 4678 of the Revised Statutes.[2] The defendants contested the jurisdiction of the trial court and alternatively filed a motion to dismiss under the doctrine of *forum non conveniens. Id.* at 675. The trial court found it had jurisdiction over the suit, but nevertheless dismissed the suit on the alternative ground. *Id.* Focusing on the applicability of *forum non conveniens* under the civil practice and remedies code, the supreme court held that section 71.031 had abolished the doctrine. *Id.* at 679. Thus, the matter was allowed to proceed to trial.

Four justices filed vigorous dissenting opinions. Importantly, however, each ac-

---

1. We note that given the numerous defendants initially joined in this action, there is a strong possibility that Texas courts had unequivocal personal jurisdiction over an original defendant. Nevertheless, Texas courts must assert personal jurisdiction over each and every defendant in an action independently. *See National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995). Thus, each defendant is charged with making individual challenges to the exercise of juris-

diction or waiving any objection to the continuation of the suit in this state.

2. Article 4678 is the statutory predecessor to TEX. CIV. PRAC. & REM.CODE ANN. § 71.031 (Vernon 1995). There was no substantive change under the recodification of article 4678. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 1.001(a) (Vernon 1995).

knowledged the implicit holding in *Alfaro:* a non-resident plaintiff may bring an action for wrongful death or personal injury in this state, notwithstanding certain procedural countermeasures. For instance, Chief Justice Phillips noted in his dissent that "the statute allows these plaintiffs to bring suit in Texas," but noted that the trial court should have the power to apply common law procedural defenses as a limiting factor. *Id.* at 689 (Phillips, C.J., dissenting). Justice Cook acknowledged that "properly read, the statute is asymmetrical . . . . it confers upon the plaintiffs an absolute right to bring claims in our courts, [but] it does not impose upon our courts an absolute responsibility to entertain those claims." *Id.* at 697 (Cook, J., dissenting). Justice Hecht acknowledged that section 71.031 permits a party to enforce a wrongful death or personal injury cause of action in this state, noting that the statute "prohibits dismissal of an action within its ambit solely because plaintiffs reside or the action arose outside Texas." *Id.* at 704 (Hecht, J., dissenting). All three opinions noted the inherent power of the Texas courts to exercise discretion in dismissing cases which are too tenuously connected to this state. *Id.* Finally, Justice Gonzalez argued that the courts must have discretion to dismiss for *forum non conveniens* when the aggregation of certain factors weigh in favor of an alternative forum. However, Justice Gonzalez acknowledged that absent a party's proper motion to dismiss, the continuation of a foreign suit in this state is not error. *Id.* at 695.

■ While the *forum non conveniens* discussion in *Alfaro* is clearly inapposite in this instance,[3] one clear result of that case is immediately applicable. Section 71.031 and its relevant enabling statutes, permit a foreign plaintiff or its survivors to bring and maintain a wrongful death or personal injury cause of action in this State.[4] Thus, we hold that Walters had standing to pursue his claim in Texas, and accordingly, we hold that his survivor maintains the same ability here, subject to the procedural safeguards which are part of the rules of civil procedure.

PCC argues that two cases limit the ability of a foreign plaintiff to bring claims for foreign injuries here. *See Total Oilfield Servs.,* 711 S.W.2d at 238–39; *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182 (Tex.1968). We disagree. In *Marmon,* the court merely held that the Texas wrongful death statute, prior to an amendment, did not have extraterritorial application. *See Marmon,* 430 S.W.2d at 186–87. That problem was eliminated by a 1975 amendment to section 71.031 expanding the cause of action to out-of-state injuries. The *Total Oilfield Services* case is equally inapplicable as to the issue of standing. The *Total Oilfield* court limited its opinion to its conclusion that a contacts test for determining choice of law issues had been wrongly applied by the court of appeals. *See Total Oilfield Servs.,* 711 S.W.2d at 239. Neither case suggests that a foreign plaintiff lacks standing to bring a wrongful death suit in Texas and neither bars such a plaintiff from bringing claims arising beyond the Texas border.

Appellant's first issue is overruled.

---

3. An amendment to the civil practice and remedies code now permits dismissals for *forum non conveniens.* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051 (Vernon 1997). These provisions are subject to special rules concerning asbestosis claims. TEX. CIV. PRAC. & REM.CODE ANN. § 71.052 (Vernon 1997). None of those issues are pertinent in this context, because PCC has waived any argument on the convenience of this forum or the application of those statutes to this proceeding.

4. Even the United States Supreme Court has acknowledged that "it is possible that 'Texas has constituted itself the world's forum of final resort, where suit for personal injury or death may always be filed if nowhere else.'" *Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 144–45, 108 S.Ct. 1684, 1688–89, 100 L.Ed.2d 127, 135 (1988).

## Choice of Law

■ By its second issue, PCC argues that since Texas has no relationship to this case, the trial court erred by applying Texas substantive law on controlling issues in this case. The choice of which state's law should apply to a particular case is a question of law and is subject to *de novo* review. TEX.R. EVID. 202; *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984).

■ A court may take judicial notice of the laws of another jurisdiction at any point in a proceeding. *See* TEX.R. EVID. 202. The issue of a choice-of-law determination is distinct from the court's power to generally take judicial notice of a foreign state's law. Thus, the mere fact that the court may take judicial notice of foreign laws does not mean that choice-of-law issues may be raised at any point in the proceeding. A preliminary motion is, therefore, necessary to assure the application of the laws of another jurisdiction. *General Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 919–20 (Tex.1993); *see also International Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 393, 106 S.Ct. 1904, 1913, 90 L.Ed.2d 389 (1986). The court may undertake a choice of law analysis *sua sponte*, but rule 202 does not compel this action.

■ Moreover, the party requesting judicial notice must "furnish the court sufficient information to enable it properly to comply with the request." *Id.* Upon receiving such a motion, Rule 202 compels the court to take judicial notice. However, the failure to provide adequate proof relieves the court of this requirement and results in a presumption that the law of the foreign jurisdiction is identical to the law of Texas. *See Holden v. Capri Lighting, Inc.*, 960 S.W.2d 831, 833 (Tex.App.—Amarillo 1997, no writ). Thus, absent a motion by a party, the law of Texas may be applied to a dispute. TEX.R. EVID. 202; *Creavin v. Moloney*, 773 S.W.2d 698, 702 (Tex.App.—Corpus Christi 1989, writ denied).

The parties alternatively argued that the law of several jurisdictions should have been applied to this dispute. In February, 1995, defendant Owens–Corning Fiberglass Corporation filed a motion to take judicial notice of California law without any reference to or proof of that law. The trial court permitted PCC to adopt this motion. In March, 1996, Walters filed a motion for the application of Virginia law. More than one year later, PCC filed a motion to apply maritime law and an accompanying brief outlining relevant Texas law on gross negligence and punitive damages only. The motion to apply maritime law did contain a discussion of the applicability and effect of maritime law on this case. Four days later, PCC filed a motion opposing the application of Virginia law, claiming that maritime law or California law should apply. This motion, however, contained no information about the relevant substantive law of California. Approximately one week later, and about five days prior to trial, PCC served four documents addressing various aspects of California law: (1) application of a government contract defense; (2) employer conduct and superseding cause; (3) the proper burden of proof of proximate causation; and (4) limitation of liability for non-economic damages amongst multiple defendants. On the eve of trial, after the hearing on preliminary motions, PCC served additional documents outlining relevant Virginia law regarding limitations, liability, damages, and joint liability, and requesting the court to apply Virginia law.

■ In this instance, PCC did not provide the court with an adequate and timely motion to apply the substantive law of either California or Virginia to the facts of this case.[5] As demonstrated above,

---

5. We note that Texas applies the "most significant relationship test" to choice of law questions to determine which jurisdiction's substantive law should govern in a case. *See Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979); RESTATEMENT (SECOND) OF CONFLICT

PCC adopted the motion to take judicial notice of California law.[6] However, this motion did not contain any significant recitation of California law or any indication where such law could be found. Thus, it did not comply with the requirements of rule 202. The trial court did not err by refusing to apply California law. Additionally, PCC filed motions to apply Virginia law. However, these motions were untimely. *See Clayton v. Newton,* 524 S.W.2d 368, 371 (Tex.Civ.App.—Fort Worth 1975, no writ) (trial court did not err by applying Texas law instead of Oklahoma law when no pre-trial motion to apply Oklahoma law was filed). Walters abandoned her motion to apply Virginia law by not raising it in the pre-trial hearing, so PCC's attempts to adopt that motion were unavailing.

■ Furthermore, the trial court denied PCC's complete and timely motion to apply maritime law to this dispute. As noted above, we must review this decision *de novo* as it concerns a question of law. We hold that the trial court did not err.

The Fifth Circuit has held in a similar case that "the tort claims of land-based insulators against the manufacturers and distributors of asbestos products do not invoke ... admiralty jurisdiction." *Woessner v. Johns–Manville Sales Corp.,* 757 F.2d 634, 649 (5th Cir.1985). In *Woessner,* the plaintiffs were three land-based insulators who contracted asbestosis while repairing and installing insulation on ships located in shipyards, dry docks, and on navigable waters. *Id.* at 637. Despite the fact that some of the plaintiffs' exposure to

asbestos dust undoubtedly occurred on seafaring ships, the court held that there was no sufficient nexus between their work and "traditional maritime activity." *Id.* at 649 (quoting *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972)).

Primarily, the court determined that the plaintiffs' work was not work traditionally done by members of a ship's crew. The court also found the fact that the work was done on ships was incidental, holding that "nothing about the underlying claims would be different if all of the appellants' exposure had occurred during the construction or repair of buildings on land." *Id.* at 646. Furthermore, "the fact that asbestos insulation is not peculiar to maritime activities" suggested that ship-board asbestos insulation was not subject to maritime law. *Id.* at 647. The court found both the type of injury and the cause of that injury had "little if any relationship to maritime navigation or commerce." *Id.* The court acknowledged that a claim sounds in maritime law only when the injury is of a "uniquely maritime character such as a ship collision or sinking" while the ship is on navigable waters. *Id.*(citing *Sperry Rand Corp. v. Radio Corp. of Am.,* 618 F.2d 319, 321 (5th Cir.1980)).

The facts of the instant case are remarkably similar to the facts in *Woessner.* Walters was involved in oversight on submarine construction projects while enlisted in the United States Navy. Acting in that capacity, Walters' activities were not like those of a crew member, but instead, more

of Laws §§ 6, 145 (1971). The Restatement test lists numerous factors to consider in determining which jurisdiction has the most significant relationship to a case, including: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship between the parties is centered. *See* Restatement (Second) of Conflict of Laws § 145. It appears that California has the most significant relationship to this dispute.

**6.** We note also that while PCC did submit proposed jury charges and instructions on Virginia and maritime law, it did not submit a similar charge on California law. Thus, any argument that the court erred in refusing to apply California law has been wholly waived. *See* Tex.R. Civ. P. 279; *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222–23 (Tex.1992).

closely approximated those of the *Woessner* plaintiffs. The mere fact that Walters was enlisted in the Navy at the time does not mean that all of his actions were subject to maritime law. Walters did not plead that his injuries occurred while the submarines were at sea. The fact that the injuries were sustained during the construction of the submarines shows little or no connection to maritime navigation or commerce and eliminates the possibility that these were "uniquely maritime injuries." The *Woessner* court also rejected any suggestion that mere participation in the construction of a sea-bound vessel, even if done on the water, is sufficient to invoke maritime law. *Id.* at 649. Thus, the holding in *Woessner* is applicable to the instant case, and as such, the trial court did not err in its refusal to apply maritime law to this case. Accordingly, PCC's second issue is overruled.

### Admission of Death–Bed Videotape

 By its third issue, PCC argues that the trial court erred by admitting an edited videotape with sound, depicting Douglas Walters in the hospital four days prior to his death, as evidence of Walters' then-existing physical and mental condition. Specifically, PCC claims that the court erred because Walters' counsel circumvented the rules regarding depositions and denied PCC any opportunity to cross-examine Walters. PCC also asserts that the videotape constitutes hearsay evidence not subject to any exception and that the presentation of the videotape was unfairly prejudicial.

The videotape in question was originally one-and-one-half-hour in length, but was edited by Walters' counsel down to a four- and-one-half-minute presentation. On the video, Walters appeared extremely gaunt, with sunken cheeks and protruding bones. The tape, in part, showed Walters slowly walking through hospital hallways and using an IV stand for support. In other parts, Walters was in bed. Throughout, Walters, whether prompted or not, made comments about his physical condition and the pain he was experiencing. PCC's only objection was to the audio portions of the videotape. Therefore, we will focus solely on that issue.[7]

PCC contends that the audio portion of the videotape constitutes a deposition to perpetuate testimony. Thus, they argue that Walters did not comply with the requirements of rule 187. We disagree. While the statements contained on the audio portion of the videotape are certainly testimonial evidence, not all admissible testimonial statements must be given during depositions. The mere fact that a witness or a party has given a statement which may be used in court does not automatically invoke the cross-examination protections provided by the rules of civil procedure, although such statements are clearly subject to the rules of evidence. A deposition may have been the preferable method of preserving this evidence, but it was not the exclusive method for doing so. We do not find any conflict with rule 187.

 PCC further objected to this testimony as hearsay.[8] The court admitted the testimony under rule 803(3), which provides that a statement is not excluded as hearsay if the statement is of "the declarant's then existing state of mind, emotion, sensation, or physical condition...." Tex.R. Evid. 803(3). Statements admitted under the rule are "usually spontaneous

---

7. PCC implies in several different places in its brief that exhibition of the edited videotape was more prejudicial than a presentation of the unedited version of the tape would have been. While this issue is not fully briefed, for the purpose of explanation, we reject any such argument because such an error could have been cured by resort to the rule of optional completeness. Tex.R. Evid. 106.

8. The record reflects that PCC made blanket objections to the entire tape as inadmissible hearsay and unfairly prejudicial. We find no reference in the record, and the parties cite us to none, of any objections by PCC to specific portions of the tape.

remarks about pain or some other sensation, made by the declarant while the sensation, not readily observable by a third party, is being experienced." *Ochs v. Martinez*, 789 S.W.2d 949, 959 (Tex.App.—San Antonio 1990, writ denied).

Here, the statements made by Walters fall within the exception in rule 803(3). Walters explained the pain he was enduring, the difficulties he was having, and the sensations he was feeling during the time that the tape was recorded. Without his descriptions, the finder of fact would have seen a videotape displaying a gaunt and dying man, but would not have been aware of the physical pain he was suffering. PCC's assertions that these statements were staged responses to questions from counsel are unpersuasive here. Were we to adopt that position, any statement ever made in response to even the simplest question would immediately become inadmissible hearsay. Rule 803(3) is not so dogmatic. We hold that in this instance, Walters' responses were sufficiently spontaneous and contain practically no danger of faulty perception or memory to vitiate exclusion.

■■■■ Finally, PCC argues that presentation of the videotape was far more prejudicial than probative. The fact that evidence has some prejudicial effect is insufficient to warrant its exclusion. Instead, there must be a demonstration that introduction of the evidence would be *unfairly* prejudicial to the objecting party. *See* Tex.R. Evid. 403 (emphasis added). Moreover, to be excluded, "evidence must not only create a danger of unfair prejudice, but such danger must substantially outweigh its relevance." *John Deere Co. v. May*, 773 S.W.2d 369, 374 (Tex.App.—Waco 1989, writ denied). A trial court's decision to admit evidence is committed to its sound discretion and we will reverse only if there is a demonstrable abuse of that discretion. *See Beaver v. State*, 736 S.W.2d 212, 216 (Tex.App.—Corpus Christi 1987, no pet.).

■■■■ The presentation of the tape may have had the ancillary effect of arousing the sympathy of the jury for Walters' plight, but the trial court did not err in concluding that this tape had sufficient probative value to overcome whatever prejudice it created. Douglas Walters' condition at or near the time of his death was a necessary part of his wife's case. The videotape used at trial was an effective means of presenting that condition in its unexpurgated form. *See generally Apache Ready Mix Co., Inc. v. Creed*, 653 S.W.2d 79, 84 (Tex.App.—San Antonio 1983, writ dismissed) (videotape of injured child was admissible where personal encounter with jury was not feasible or otherwise more prejudicial). PCC argues that the presentation of the video was needlessly cumulative of other testimony. We disagree. While there may have been some degree of repetition in the videotape, the tape was also Douglas Walters' only opportunity to inform the jury about his condition. Under those circumstances, we cannot say that the evidence contained on the tape was unnecessarily cumulative.

PCC cites this court to several federal cases which it claims support its position. *See Bolstridge v. Central Maine Power Co.*, 621 F.Supp. 1202 (D.Me.1985); *Thomas v. C.G. Tate Const. Co.*, 465 F.Supp. 566 (D.S.C.1979). However, our review of these cases has led us to a contrary conclusion. For instance, in *Thomas*, the plaintiff was badly burned in an automobile accident. *Thomas*, 465 F.Supp. at 567. During his stay in the hospital, he and his wife were videotaped during a physical therapy session. *Id.* After an extensive discussion of the tape's contents, the court held the tape was inadmissible because of the likelihood that it would prejudice the jury. *Id.* at 571. The court specifically noted that its decision was influenced by the fact that the plaintiff would be available to testify at trial. *Id.*

Similarly, in *Bolstridge*, the court rejected the plaintiff's attempts to introduce a day-in-the-life video. 621 F.Supp. at 1204.

Importantly, the court held that "videotapes should be admitted ... only when the tapes convey the observations of a witness to the jury more fully or accurately than for some specific, articulable reason the witness can convey to them through the medium of conventional, in-court examination." *Id.* The court again was influenced by the fact that the plaintiff was available to testify and could make the same demonstrations in court that were shown on the videotape. *Id.* Clearly, Douglas Walters was not available to testify in this case, and thus, *Bolstridge* and *Thomas* are distinguishable.

We hold that the trial court did not err by permitting the presentation of the videotape and its audio portion. Accordingly, PCC's third issue is overruled.

### Admission of Expert Testimony

By its fourth issue, PCC complains of the admission of certain expert testimony. First, PCC complains that three of four experts who testified that Unibestos was unreasonably dangerous had no qualifications in the relevant area and that those opinions had no reliable scientific foundation. Second, PCC argues that expert testimony on the ultimate issue of PCC's negligence or gross negligence was improper.

The rules of evidence permit a witness "qualified as an expert by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding the evidence or determining a fact issue." Tex.R. Evid. 702; *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 718 (Tex.1998). The trial court must make a preliminary determination regarding the expert's qualifications. Tex.R. Evid. 104(a).

#### A. The Qualifications of the Experts

■ PCC argues that appellant bore the burden to prove her experts actually had the special knowledge necessary to assess the known and/or knowable hazards to bystanders in nuclear submarine construction environments in the 1960's. PCC asserts that such knowledge would require education, training, or experience in industrial hygiene, occupational medicine, or some similar field. Rule 702 does not prescribe such a narrow field. *See Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 827–28 (Tex.App.—Texarkana 1996, writ denied) (expert need not be licensed in pertinent area to be qualified); *Burlington N. R.R. v. Harvey*, 717 S.W.2d 371, 378 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (anesthesiologist could testify as an expert in the field of urology).

■ In this instance, the three witnesses were all physicians. Dr. Arnold Brody, Ph.D., is a pathologist and a cellular biologist who has researched the molecular biological effects of asbestos fiber inhalation. He is a lecturing professor of pathology at Tulane University Medical School. He has researched the link between asbestos and lung disease for more than fifteen years. He has more than 200 publication credits.

■ Dr. Sam Hammar is a pathologist who specializes in the diagnosis of mesothelioma. Dr. Hammar.has studied asbestos-related disease for more than twenty years. He is the author of a treatise on the diagnosis of those diseases. Dr. Hammar has also published more than eighty articles, most of which relate to asbestos-related disease. He has diagnosed more than 1000 cases of mesothelioma and has seen more than 3000 such cases. A significant number of his cases have involved inhaled asbestos fibers during shipbuilding activities.

■ Dr. William Maguire is a pulmonary physician who treated Mr. Walters. He has been in practice in San Diego, California since 1989. In that time, he has seen between ten and twenty mesothelioma cases. He has extensive pulmonary training and teaches pulmonary diagnoses

in a program at Grossmont Hospital in California.

Each of these witnesses qualifies as an expert on the nature and causes of mesothelioma.[9] Their experience and training are focused on the issues presented by this case. Thus, it is helpful to a jury. As a result, each is qualified, upon a showing of reliability, to give an opinion about the relative dangerousness of asbestos.[10]

### B. Reliability of Expert Testimony on Asbestos

 PCC argues that the expert opinions that Unibestos was unreasonably dangerous lacked a reliable scientific foundation. Each of the foregoing expert witnesses testified that products containing asbestos are more dangerous than the average person would reasonably anticipate.

Once an expert's qualifications are established, the proponent of such testimony must demonstrate that the evidence is relevant and reliable before the testimony can be admitted. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Gammill,* 972 S.W.2d at 720. The requirement of reliability has been extended to all proffered expert testimony. *Gammill* at 726. Generally, two considerations govern determinations of reliability. Where the offered testimony is purely scientific, the supreme court has delineated a non-exclusive list of factors to consider. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556. These factors include:

(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or

technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique.

*Id.* at 556–57. Where application of the *Robinson* factors proves unavailing, the court must consider whether "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill,* 972 S.W.2d at 727.

Thus, by applying these tests to opinions proffered by a party, the trial court assumes its role as a "gatekeeper." The trial court need not determine "whether an expert's conclusions are correct, but only whether the analysis used to reach them is reliable." *Id.* at 728. The trial court retains discretion in determining the admissibility of expert testimony. *Id.* at 719. We will reverse the decision only if there is an abuse of that discretion. *Id.; see also Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

PCC relies on the supreme court's opinion in *Havner* to support its contentions. *See Merrell Dow Pharm. v. Havner,* 953 S.W.2d 706 (Tex.1997). In *Havner,* the court was faced with determining the reliability of expert testimony on causation. *Id.* at 709. At issue in *Havner* was the plaintiffs' contention that the drug Bendectin, when ingested by pregnant women, caused birth defects. *Id.* at 708. The court acknowledged that while thirty studies of the drug had been performed, "none of these studies concludes that children of women who took Bendectin during pregnancy had an increased risk of ... birth defects," and stated that some of the studies affirmatively concluded that there was no link. *Id.* The court also described the history of Bendectin litigation, noting that in the many cases involving Bendectin and birth defects, most courts found the expert

---

**9.** PCC does not contest the qualifications of Walters' other expert, Dr. David Egilman.

**10.** To the extent that Maguire's qualifications fall short of those usually seen in experts,

admission of his testimony on subjects requiring expert opinion constitutes harmless error because his testimony was merely cumulative of the opinions related by the other experts.

evidence of causation to be either legally insufficient or inadmissible. *Id.* at 709–10 (citations omitted).

The *Havner* court held that an expert's opinion must exceed the adoption of "magic language" used by others; instead, the underlying basis for the opinion "should be independently evaluated in determining if the opinion itself is reliable." *Id.* at 712–13. Thus, the court noted, a credentialed expert's opinion that "the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system," would be unreliable scientific evidence and as such, no evidence.

Here, the *Havner* problems do not arise. In the first place, this suit does not raise issues of causation.[11] *Havner* focused solely on scientific proof of causation. Moreover, the general principles embraced by *Havner, Gammill, Robinson,* and *Daubert* are satisfied by the testimony of Walters' experts. Drs. Brody and Hammar each testified about the unreasonably dangerous nature of amosite asbestos. In each instance, the witness described a long history of researching asbestos-related lung diseases, including mesothelioma. Each stated that this extensive research, coupled with the research of others, had led to the universal conclusion that amosite asbestos causes mesothelioma in exposed persons. They agreed that exposures for as little as one day and for as long as several months or years have been reported to cause mesothelioma. Dr. Brody explained the process by which asbestos fibers attack the cilia within the respiratory system and eventually find their way to the pleural lining outside of the lung. He detailed the manner in which the fibers attack the cells of the pleural lining, hardening them and constricting lung expansion.

Both Brody and Hammar testified that asbestos exposure is the only known cause of mesothelioma. The doctors were in accord in their assessment that asbestos is a leading known cause for several other pulmonary infirmities. Brody and Hammar each concluded that mesothelioma is irreversibly fatal. Based on this research and knowledge, each opined that amosite asbestos is unreasonably dangerous.

These opinions clearly satisfy the *Robinson* factors. There is no dispute that asbestos causes lung disease. This thesis has been tested and retested with unequivocal results. Many experts have detailed this conclusion in publications. Thus, there is only the smallest degree of subjective interpretation involved in reaching that conclusion. Brody and Hammar testified that their publications are subject to peer review and that such reviews have agreed with their conclusions. Thus, the conclusions about asbestos are universally accepted in the scientific community.

PCC contends that this testimony is unreliable, however, because it fails to account for the state of scientific knowledge available at the time that Walters was exposed to Unibestos. Thus, we must determine whether Walters produced any expert testimony showing that PCC knew or should have known, prior to June 1966, that Unibestos was an unreasonably dangerous product.

Dr. David Egilman is an expert in the history of medical literature and particularly, asbestos literature. He testified about the development of research regarding the hazardousness of asbestos. He noted that in the mid–1960's, studies were published conclusively showing asbestos-related exposure sickness in bystanders. Egilman showed that in 1965, the Sunday London Times had published an article describing this link. He testified that a copy of the article was found in PCC files. Egilman also testified that private research indicated that there was no safe level of asbestos exposure and he pointed

---

11. In other words, there is no dispute here that Douglas Walters' condition was caused by inhalation of asbestos fibers.

to a 1967 article which stated that conclusion. This article cited others published in 1964 and 1965 corroborating this conclusion. Additionally, Egilman stated that the article described a conclusive link between exposure to all types of asbestos and mesothelioma in animals. He also cited a 1960 article detailing a large case study which also acknowledged the link between asbestos and mesothelioma. He stated that PCC had copies of most of this literature in its files.

Egilman also noted that at a meeting of the Board of Directors of the National Insulation Manufacturers Association held on April 14, 1964, Johns–Mansville Sales Corporation, a leader in asbestos manufacturing, announced that it was placing warnings on cartons of asbestos. According to its own documentation, PCC representatives were at this meeting and were aware of the Johns–Mansville warning. Egilman testified that this indicated that manufacturers of products containing less asbestos than Unibestos were not only cognizant of the dangers posed by asbestos, but were also affirmatively warning users of those risks. Egilman concluded that sufficient documentation of the dangers of asbestos was available to PCC in May, 1962, before it ever produced Unibestos.

PCC questioned Egilman's conclusions about its knowledge of the danger associated with amosite asbestos. In particular, PCC indicated an awareness of a threshold limit value (TLV) and questioned Egilman about the toxicity of asbestos in amounts below the since-abolished TLV. Egilman responded by discounting the appropriateness of the TLV and indicated that PCC understood that there was a dispute about the definition of TLV. He stated that the TLV applied only to pure amosite asbestos products and not to "double hazard products" like Unibestos. He stated that the inapplicability of TLV to Unibestos was established by the mid–1960's.

Our review of Egilman's testimony indicates that his assessments of both PCC's ability to know of amosite's dangers and PCC's negligence were reliable. Egilman's testimony is analytically sound. He reviewed voluminous publications regarding the dangers of asbestos. He acknowledged that he was unsure about the universe of documents available to PCC, but was certain that any documents in PCC's files reached the same conclusion. Egilman agreed that the research has become more sophisticated over time, but stated that by the mid–1960's, evidence existed that exposure to amosite asbestos caused lung diseases, including mesothelioma. He concluded PCC was negligent in failing to place warnings on its products.

Moreover, Egilman's conclusions are based upon his review of reliable testimony. The understanding of the dangers of asbestos is still evolving. However, Egilman's review of the documents available in the early 1960's indicates that many scientists agreed that asbestos was a dangerous product. The volume of publications reaching the same conclusion is sufficient to provide Egilman with an objective basis to conclude that contemporary science had found asbestos dangerous. This demonstrates, furthermore, that the conclusions about asbestos were widely-accepted in the scientific community. Egilman's testimony is merely a recitation of the relevant studies available at the time of Walters' exposure. This testimony was reliable.

The Walters' experts demonstrated to the trial court through reliable and relevant testimony that Unibestos was an unreasonably dangerous product and that PCC was aware of those dangers. Thus, the court did not merely accept the argument that Unibestos was unreasonably dangerous because it is more dangerous than contemplated by the ordinary user based on what is now known about its risks.

### C. Testimony Regarding Negligence and Gross Negligence

PCC further argues that the expert testimony on the ultimate issue of

whether it was negligent or grossly negligent was improper.

■■■■■ A witness may give testimony in the form of an admissible opinion or inference on a subject embracing the ultimate issue in a case. TEX.R. EVID. 704. Therefore, an expert witness may testify as to his or her opinions regarding negligence and gross negligence. *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex.1987) (expert could testify that defendant doctor's conduct constituted negligence and gross negligence). When asked to state an opinion regarding a defendant's negligence or gross negligence, the witness must be provided with the proper legal standard as a predicate. *See Isern v. Watson*, 942 S.W.2d 186, 193 (Tex.App.—Beaumont 1997, no writ) (expert provided proper legal definition of negligence and gross negligence); *Metot v. Danielson*, 780 S.W.2d 283, 288 (Tex.App.—Tyler 1989, writ denied) (error in excluding expert's testimony on negligence where expert given legal standard of negligence prior to stating conclusion).

The record in the instant case reflects that prior to stating their conclusions, each expert was furnished with a correct legal definition of negligence. Moreover, Dr. Egilman, the only witness to testify as to gross negligence was furnished with that definition as well. We find no error in the admission of this testimony.

PCC's fourth issue is overruled.

### Admission of Documents

By its fifth issue, PCC complains that the trial court erred by admitting irrelevant and unfairly prejudicial documents. Specifically, PCC complains about the admission of an article published in the *New York Times* on March 2, 1966, and two excerpts from the Federal Register.

■■■■ The *New York Times* article describes a report that autopsies of recently-deceased persons demonstrated that 25 percent had asbestos lodged in their lungs.

When the article was initially presented during trial, PCC objected to the unauthenticated document as hearsay. However, the record reflects that after a conference, PCC withdrew its objection to the exhibit for notice purposes. When Walters moved to admit the exhibit, PCC again made no objection. Thus, any objection to the admission of this document was waived. *See* TEX.R.APP. P. 33.1(a).

■■■■ Moreover, the article indicates that PCC had, at the very least, constructive notice of the dangers associated with asbestos-related products. We have noted in a similar context that whether or not "the manufacturer was aware of information regarding the dangers of asbestos use at the time of marketing is immaterial since an asbestos manufacturer is charged with the duty to know the dangers of asbestos products." *Keene Corp. v. Belford*, 881 S.W.2d 608, 610 (Tex.App.—Corpus Christi 1994, no writ) (citing *Borel v. Fibreboard Paper Prod. Corp.*, 493 F.2d 1076, 1089–90 (5th Cir.1973), *cert denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)). Thus, like Egilman's testimony, the article provides some evidence of what PCC should have known about its product.

■■■■ PCC did object to the admission of two excerpts from the Federal Register dated June 20, 1986. Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite; Final Rules, 51 Fed.Reg. 22615 & 22628 (1986). The excerpts state that the Occupational Safety and Health Administration (OSHA) has found asbestos universally harmful. PCC argues that these excerpts are irrelevant because they describe findings which came at least twenty years after Walters' exposure to Unibestos. However, these documents were used during the testimony of Dr. Brody, who testified only to the inherent dangerousness of asbestos-containing products. Used in that context, the documents were used to support the underlying basis for Brody's testimony. *See* TEX.R. EVID. 705. The conclusions stated in the

excerpts comported with Brody's independent assessment of the dangers associated with asbestos and, as such, were admissible. *See New Braunfels Factory Outlet Ctr., Inc. v. IHOP Realty Corp.*, 872 S.W.2d 303, 310 & n. 5 (Tex.App.—Austin 1994, no writ) (expert can testify from a published hearsay article as a basis for his or her opinion).

Accordingly, PCC's fifth issue is overruled.

### Sufficiency of the Evidence

By its sixth and seventh issues, PCC complains that the evidence was legally and factually insufficient to support the jury's finding of liability and its damages findings. PCC also argues that the jury's damages award was excessive.

 In order to establish a marketing defect claim predicated on a failure to warn about the dangers of asbestos, a plaintiff must demonstrate that:

(1) the risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed; (3) the product contains a marketing defect; (4) the absence of a warning and/or instruction renders the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

*Sims v. Washex Machinery Corp.*, 932 S.W.2d 559, 562 (Tex.App.—Houston [1st Dist.] 1995, no writ); *see also Keene Corp.*, 881 S.W.2d at 610 (citing *Borel*, 493 F.2d at 1095; *Pittsburgh Corning Corp. v. Thomas*, 668 S.W.2d 876, 878–79 (Tex. App.—Houston [14th Dist.] 1984, no writ)). Taken in this context, as noted above, a

manufacturer will be found to have sufficient notice if it could have reasonably ascertained the dangers associated with its product. *Keene Corp.*, 881 S.W.2d at 610.

 In conducting a legal sufficiency review, we may only consider the evidence and inferences tending to support the findings. This evidence must be viewed in a light most favorable to the findings and we must disregard any evidence and inferences to the contrary. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988). So long as there is more than a scintilla of evidence supporting the finding, the challenge must be overruled. *Id.* By contrast, in a factual sufficiency review, we examine all of the evidence, regardless of its effect on the reviewed finding. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986). We may reverse the challenged finding only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

### A. Evidence Supporting Finding of Liability

 PCC first complains, in its sixth issue, of the evidence supporting a finding of liability. PCC argues that it had no duty to warn of the risk of mesothelioma because Walters failed to demonstrate that reliable scientific evidence existed at the time of exposure. Dr. Egilman testified that significant publications existed in the early 1960's which indicated a causative link between asbestos exposure and lung disease, including mesothelioma. Egilman stated that several of these documents were in the possession of PCC executives. Additionally, Egilman noted that other manufacturers were contemporaneously including warnings about the risks of asbestos exposure in their packaging.[12] He demonstrated that these manufacturers were openly discussing their decision to

---

12. While PCC correctly notes that the choices of other corporations to warn does not create a duty to warn for all others engaged in the

industry, it does, nevertheless, lead to a clear inference that scientific evidence suggested certain dangers from exposure to asbestos.

include those warnings at meetings PCC attended. Egilman stated that these manufacturers' products contained less asbestos than Unibestos. Clearly, this evidence is legally sufficient to demonstrate that PCC either knew or should have known about the risks associated with Unibestos.

PCC raised some questions regarding its ability to know that any exposure to Unibestos could result in mesothelioma. Egilman admitted that in the mid–1960's, certain permissible threshold limit values existed. He testified that some scientists believed that exposure to asbestos in quantities below the TLV was not harmful. Additionally, Dr. Samuel Forman, PCC's medical expert, stated that a report tailored specifically to the occupational risks associated with pipe-covering operations on naval vessels adopted the TLV concept, and specifically analyzed amosite asbestos insulation operations on Navy ships. Egilman and Dr. Hammar both noted that some scientists further believed that amosite asbestos was less toxic than other types of asbestos. Each acknowledged that the asbestos contained in Unibestos was amosite.

However, Egilman explained that PCC's reliance on the TLV and composition of Unibestos was misplaced. Egilman suggested that toxic exposures to "double hazard products," meaning that those containing multiple hazardous substances, like Unibestos, made the TLV inapplicable. Egilman also confirmed that contemporaneous studies were less certain that amosite was non-toxic. He noted that several studies had suggested that amosite had caused cancer in animals and further indicated that by the mid–1960's others were associating all types of asbestos to lung disease.

Moreover, PCC's own employees testified that they were aware of the risks associated with asbestos exposure. Ron Francis testified that he visited an asbestos plant to investigate its dust control methods. At or near the time of that visit, in 1965, Francis read a newspaper report which discussed the dangers of asbestos-related diseases from both direct and bystander exposure. Francis approached the company doctor to discuss this article and discovered that the PCC plant was referenced in the article and that it had a history of asbestos-related disease among its workers. Francis reported his findings to PCC executives and concluded that PCC's own plant was not safe. Dr. Forman testified that PCC's responses to Francis' letter were insufficient, stating that PCC should have investigated the possibility that such risks existed. PCC admitted that no follow-up was conducted. Based upon this evidence, the jury had factually sufficient evidence to determine that PCC either knew or should have known of the dangers associated with Unibestos.

██ PCC further argues that Walters failed to show what type of warning would have been adequate. PCC alleges that even if it had put a warning on its cartons, there is no evidence that Walters, as a bystander, would have been cognizant of the warning. Virmon Arms, Walters' co-worker, was also exposed to Unibestos as a bystander. He stated that he was close enough to the Unibestos boxes to notice a warning. He further stated that had such a warning existed, both he and Walters would have heeded it. However, resort to such conjecture is unnecessary. The Texas Supreme Court has concluded that where a product presents a danger and no warning about that danger has been given, it will presume that the now-deceased person would have heeded the warning had it been given. See General Motors Corp. v. Saenz, 873 S.W.2d 353, 359 (Tex.1993); Magro v. Ragsdale Bros., 721 S.W.2d 832 (Tex.1986). PCC admitted that its product did not contain a warning of any type. Therefore, we apply the presumption in Walters' favor. Accordingly, we hold that there was sufficient evidence to support the jury's finding.

■ Finally, PCC argues that the jury lacked factually or legally sufficient evidence to conclude that it was grossly negligent. In that regard, PCC asserts that Walters had to produce evidence of actual corporate knowledge of the risks associated with asbestos exposure and that a corporate official with authority to act had that information and consciously chose to ignore the risks. As noted above, Dr. Egilman testified about the copious documents found in PCC's files noting the link between amosite and lung disease. Francis acknowledged that he had consulted with other physicians, in 1965, about the risks associated with asbestos, and that he had reported those findings to PCC's President, Vice President of Manufacturing, and Technical Director, among others. Walters produced evidence which indicated that PCC was aware that workers were exposed to high levels of asbestos dust from its product. Still, PCC claimed in its literature that there were no hazardous chemicals in the dust created by cutting and did nothing to warn any product users of those hazards. The jury had sufficient evidence to conclude that PCC was grossly negligent in marketing its Unibestos product without a warning. PCC's sixth issue is overruled.

### B. Evidence Supporting the Jury's Damages Findings

By its seventh and final issue, PCC argues that the evidence was factually and legally insufficient to support the jury's damages findings and that, therefore, the damages awarded by the jury were excessive. The judgment recites the following damages awards by the jury:

1. Cecile Walters for the estate of Douglas Walters... $5,722,199.22
2. Cecile Walters individually... $2,145,825.70
3. Richard Walters (father of Douglas Walters) ......... $ 145,437.54
4. Arline Walters (mother of Douglas Walters) ......... $ 145,437.54
5. Punitive Damages .......... $ 0.00

**TOTAL** ..................... $8,158,900.00

The calculation of Cecile Walters' individual award was based on her past and future pecuniary losses, loss of companionship and society, and mental anguish. The awards to Richard and Arline Walters were based on their past and future losses of companionship and mental anguish. Finally, the award to the estate of Douglas Walters was based on his pain and mental anguish and his medical expenses.

■ In assessing a claim that damages are excessive, the court of appeals employs a sufficiency review. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998); *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 847–48 (Tex.1990). With regard to the generally nebulous issues of pain and suffering and loss of society, such issues are "necessarily speculative, and it is peculiarly within the province of the jury to resolve these matters and set the amount of such damages." *Rodriguez v. Kvasnicka,* 710 S.W.2d 724, 727 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.). As long as there is some direct evidence of "substantial disruption in the plaintiffs' daily routine," we will not overturn the jury's verdict. *See generally Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995) (some proof of substantial disruption necessary to support jury finding of mental anguish). This evidence must exceed mere emotion. *Id.* However, evidence of damage may be implied from "illness or injuries accompanied by physical pain that is proximately caused by the defendant." *Kingham Messenger & Delivery Serv., Inc. v. Daniels,* 435 S.W.2d 270, 273 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ). Moreover, evidence of a "loss of enjoyment of life" may be considered in assessing non-physical damages. *Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 674–75 (Tex.App.—Texarkana 1991, writ denied).

■ The record in this case is replete with evidence of the negative impact suffered by Douglas Walters, his wife, and his parents during the pendency of his illness. Douglas Walters was an athletic, active man. After being diagnosed with mesothelioma, doctors extracted fluid from his

chest cavity on several occasions. In an attempt to remove the cancerous tissue from his chest and extend his life, his doctor performed a thoracotomy, but discovered that extraction of that tissue would have killed him. Because the cancer could not be removed, Walters instead underwent chemotherapy. That treatment resulted in hair loss, fever, weakness, dizziness, and nausea. As the disease progressed, Walters became noticeably short of breath and was eventually bedridden. The medical experts agreed that the pain associated with mesothelioma is excruciating and unceasing. All of the witnesses who were with Mr. Walters near the end of his life agreed that he suffered from that type of pain.

Mrs. Walters described her relationship with Doug Walters as warm and exciting. They were married for sixteen years. After his diagnosis of mesothelioma, Mrs. Walters accepted the burdens of caring for her ill husband. She was uniformly described as concerned and supportive during her husband's illness. She stayed with him at all times during his hospitalization. The doctors agreed that frank discussions of the illness and treatments were painful and difficult for Mrs. Walters to endure.

Douglas Walters was the only son of Richard and Arline Walters. They depended on their son to provide substantial support due to their age and health. His death left his parents with no other family.

Based on this evidence, the jury had a sufficient basis to support damages findings on behalf of each of the plaintiffs.

With regard to the extent of those awards, PCC argues that because the total damages are more than sixteen times the amount of reasonable and necessary medical damages, the jury's findings were clearly the result of passion and prejudice. However, we recognize that determinations of pain and suffering damages cannot be neatly confined to mathematical certainties. The jurors were provided with tre-

mendous detail regarding the pain and suffering, mental anguish, and loss of society and companionship suffered by each plaintiff. The extent of those injuries is not subject to easy calculation. Where, as here, there is some "direct evidence of the nature, duration, and severity" of the mental anguish, we will not second-guess that determination. *Woodruff*, 901 S.W.2d at 444. PCC's seventh issue is overruled.

Accordingly, the judgment of the trial court is AFFIRMED.