Appellees= Motion for Rehearing Denied; Reversed and Remanded,
Majority and Dissenting Opinions of March 31, 2009 Withdrawn; and Substitute
Majority and Substitute Dissenting Opinions filed October 8, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00465-CV

_______________

 

ROWAN COMPANIES, INC., Appellant

 

V.

 

WILMINGTON TRUST COMPANY, Not in Its Individual
Capacity but Solely as Owner Trustee of the Rowan-Halifax Jack-Up Rig, TEXTRON
FINANCIAL CORPORATION, NORTH SEA INVESTMENTS, INC., and NORTH SEA (CONNECTICUT)
LP, Appellees

                                                                                                                
                               

On Appeal from the 215th District Court

Harris County, Texas

Trial Court Cause No. 2005-70675

                                                                                                                                               


 

S U B S T I T U T E    M A J O R I T
Y   O P I N I O N

We deny the appellees= motion for rehearing, but to clarify the scope of remand,
our majority and dissenting opinions of March 31, 2009 are withdrawn and these
substitute majority and substitute dissenting opinions issued in their
respective places.








In this summary-judgment appeal, bareboat charterer Rowan Companies, Inc.
challenges the trial court=s judgment in favor of the Wilmington Trust Company, the
Owner Trustee of the oil rig Rowan-Halifax.  Rowan argues that the Owners
improperly invoked an appraisal provision in their contract with Rowan after
the oil rig was destroyed by a hurricane, thereby impermissibly increasing the
rig=s estimated residual value, and
hence, the amount Rowan was contractually required to pay for loss of the rig. 
We agree, and therefore, reverse and remand.  

I.  Factual
and Procedural Background

Rowan Companies, Inc. (ARowan@) is an international offshore and land drilling contractor. 
In 1984, Rowan entered into a sale/leaseback transaction involving the
Rowan-Halifax 166-C jack-up drilling rig (the AHalifax@).  The transaction was accomplished
through a Participation Agreement and a bareboat charter (the ACharter@), both dated December 1, 1984
(collectively, the AOperative Documents@).  The parties to the Participation
Agreement included Rowan as Charterer, Textron Financial Corporation (ATextron@) as Owner Participant, and
Wilmington Trust Company (AWilmington@) as Owner Trustee.[1]  The Charter
provided that Aso long as the Charterer=s Stockholders= Equity is at least $400,000,000, the
Charterer may self-insure up to the excess of the SLV [i.e., Stipulated Loss
Value] Amount over $55,000,000 . . . .@

  A.     Initial Appraisal








The Participation Agreement required, as a condition precedent, that
Textron receive appraisals of the Halifax by Rush Johnson Associates and Lowell
Johnston & Associates, Inc.  Both appraisals were to be dated as of the
Closing Date of the contract, contractually defined to mean December 28, 1984. 
Each appraisal was required to contain the appraiser=s estimates that, as of that date,
(1) the Halifax=s fair market value was $66.5 million, (2) the remaining
useful life of the vessel at the end of the Basic Term was at least 22 years,
and (3) the Halifax=s residual value at the end of the Basic Term was not less
than twenty percent of the owner=s cost for the Vessel, defined to be
$66.5 million.[2]  In section
18 of the Charter, the parties also provided for a Renewal Option, the terms of
which are discussed further infra and set forth in full in the appendix
to this opinion.

On December 26, 1984, Larry Hasty of Rush Johnson Associates appraised
the Halifax and opined that:

$       
The expected useful life of the
rig in December 1984 was Aat least@
twenty years.

 

$       
The Estimated Residual Value at
the end of a sixteen-year lease period was Aestimated
to be twenty (20) percent of the current fair market value, determined without
including in such value any increase or decrease for inflation or deflation
during the lease and after subtracting any costs to the rig=s owner for redelivery of the rig.@[[3]]

 

$       
A remaining useful life of five
years was Aa reasonable estimate of what the remaining useful
life of the rig@ would be at the end of the original sixteen-year
lease term.

 

$       
It was Areasonable to assume@ that it would be commercially feasible that the rig would be usable by
someone other than the lessee or an affiliate of the lessee at the end of the
original sixteen-year lease term, and it could be expected that the twenty
percent residual value would be realized at that time.

 

$       
The current fair market value of
the rig was $66.5 million.

 

There is no
evidence in the record that Textron obtained an appraisal from Lowell Johnston
& Associates, Inc., and the parties do not state if this condition was
performed or whether any party objected to its non-performance.








B.        Contract Performance

The Basic Term of the Charter passed uneventfully and expired in
September 2000.  Rowan exercised its option to renew the Charter, and the
parties agreed to a Renewal Term of seven-and-one-half years.  On August 15,
2005, Jane M. Lavoie, Textron=s vice president of operations, wrote to Bill Wells, Rowan=s treasurer and vice president of
finance, questioning the adequacy of Rowan=s insurance coverage of the Halifax: 

The insurance
certificates provided to us for the current year indicate that the hull
insurance . . . on the Halifax is for $43.35 million. 
While we do not claim to be experts on the current market value of these
assets, we note that a recent Jefferies & Company report estimates the fair
market value of 116C rigs to be $75 million and the replacement cost to be $125
million.  We understand that the Jefferies reports include information provided
by Rowan.  If this information is correct, it appears that the hull insurance
on these rigs needs to be substantially increased.

In late September 2005, Hurricane Rita struck the Gulf Coast, leaving no
trace of the Halifax.  The vessel was presumed sunk, and Rowan gave notice to
Wilmington on October 5, 2005 that the rig had been destroyed.  Rowan=s hull insurer paid policy limits
exceeding $43.35 million on the claim, and in February 2006, the parties agreed
to place the insurance proceeds in an escrow account until their dispute over
ownership of the proceeds could be resolved.

C.        The Declaratory Judgment Action 








On November 3, 2005, Rowan filed a petition for declaratory relief
against Textron and Wilmington, in Wilmington=s  capacity as Owner Trustee of the
Halifax.[4]  On November
29, 2005, Wilmington notified Rowan that it was invoking the Appraisal
Procedure as that term is defined in the Operative Documents.  Textron and
Wilmington (collectively, the AOwners@) asserted counterclaims for breach of contract, declaratory
judgment, and attorneys= fees.

On or about March 13, 2006, Rowan informed Wilmington that it calculated
the Stipulated Loss Value of the Halifax to be $22,840,898.93, plus accrued
interest.  Rowan eventually paid Wilmington this amount, which included the
Basic Hire of $2,617,489.13 payable on March 15, 2006.

On March 15, 2006, Wilmington wrote to advise Rowan that it had not
received payment of the Stipulated Loss Value, which, according to its
calculations, was  $80,235,317.37; this amount was based on the post-loss
appraisal which Wilmington organized.  In addition, Wilmington stated that the
Basic Hire payment of $2,617,489.13 due on March 15, 2006 had not been paid,[5]
and notified Rowan pursuant to Section 15(a) of the Charter that if the full
Stipulated Loss Value was not paid by close of business on March 17, 2006, a
contractual AEvent of Default@ would occur.[6]

D.        Cross-Motions for Summary Judgment








The Owners moved for traditional summary judgment, asserting that Rowan
owed Wilmington $59,882,522.06 plus interest under the terms of the Charter.[7] 
In addition, they asked the trial court to declare their rights under the
insurance provisions of their contracts with Rowan[8]
and award attorneys= fees incurred in prosecuting their contract claim. 
According to the Owners, Rowan failed to make payments that were due on March
15, 2006 resulting from the loss and failed to maintain adequate insurance.  In
its cross-motion for traditional summary judgment, Rowan asked the trial court
to declare that it had paid all amounts due under the Charter provision
governing payments due in the event of a loss.  In addition, Rowan asked the
trial court to direct the escrow agent to pay Rowan all remaining hull
insurance proceeds.[9]








On March 7, 2007, the trial court denied Rowan=s motion for summary judgment and
granted in part the Owners= motion for summary judgment.  Although the trial court did
not state the grounds for its judgment, it ruled that the Owners= motion was Agranted as set out [in the trial
court=s final judgment] and otherwise
denied.@  Specifically, the court ordered
Rowan to pay Wilmington (1) $59,882,522.06; (2) interest on that sum
in the amount of $3,467,364.37 through October 31, 2006; (3) interest from
and including November 1, 2006 through and including March 6, 2007 at the rate
of $15,386.48 per day; (4) $500,000 for reasonable and necessary attorneys= fees; and (5) post-judgment
interest on the sum of all of these amounts.  In addition, the trial court
declared that Wilmington Ais entitled to recover all proceeds paid from any hull and
machinery policies on the Halifax which were in effect at the time of its loss,
including specifically those proceeds deposited in the escrow account which the
parties jointly established . . . .@  Finally, the trial court explained
that all proceeds previously paid to Wilmington had been credited in
calculating the judgment.  Rowan=s motion for new trial was overruled
by operation of law, and this appeal timely ensued.

II.  Issues
Presented

In a single issue, Rowan contends the trial court erred in denying its
motion for summary judgment and granting summary judgment in favor of the
Owners.

III. 
Standard of Review

We review summary judgments de novo, Valence Operating Co. v. Dorsett,[10]
and if the trial court grants the judgment without specifying the grounds, we
must affirm if any of the grounds presented are meritorious.  FM Props.
Operating Co. v. City of Austin, 22 S.W.3d 868, 872B73 (Tex. 2000).  We consider all
grounds preserved for review that are necessary for final disposition of the
appeal.  See Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 626
(Tex. 1996).  In a traditional motion for summary judgment, the movant has the
burden of showing that there is no genuine issue of material fact and it is
entitled to judgment as a matter of law.  Tex.
R. Civ. P. 166a(c); Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420,
425 (Tex. 1997).  To be entitled to a final traditional summary judgment, a
defendant must conclusively negate at least one essential element of each of
the plaintiff=s causes of action or conclusively establish each element of an
affirmative defense.  Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910,
911 (Tex. 1997).  Evidence is conclusive only if reasonable people could not
differ in their conclusions.  City of Keller v. Wilson, 168 S.W.3d 802, 816
(Tex. 2005).  Once the defendant establishes its right to summary judgment as a
matter of law, the burden shifts to the plaintiff to present evidence raising a
genuine issue of material fact.   City of Houston v. Clear Creek Basin Auth.,
589 S.W.2d 671, 678B79 (Tex. 1979).








When, as here, both sides move for summary judgment, each bears the
burden of establishing that it is entitled to judgment as a matter of law;
neither side can prevail because of the other=s failure to discharge its burden. City
of Garland v. Dallas Morning News, 969 S.W.2d 548, 552 (Tex. App.CDallas 1998) (en banc), aff=d, 22 S.W.3d 351 (Tex. 2000).  On appeal, we review all
summary-judgment evidence, determine all questions presented, and render the
judgment the trial court should have rendered.  Valence Operating Co.,
164 S.W.3d at 661.  We may affirm the judgment, reverse and render a judgment
for the other side if appropriate, or reverse and remand if neither party has
met its summary-judgment burden.  Hackberry Creek Country Club, Inc. v.
Hackberry Creek Home Owners Ass=n, 205 S.W.3d 46, 50 (Tex. App.CDallas 2006, pet. denied).

IV.  Choice
of Law

The resolution of this dispute is determined by the meaning of the
contract term Aestimated residual value.@  Before we can analyze this phrase under the correct rules
of contract construction, we must determine which law applies to the various
documents governing the transactions between the parties.

A.        The Charter 








The parties agreed that the ACharter shall in all respects be
governed by, and construed in accordance with, the general maritime laws of the
United States of America and otherwise by the laws of the State of New York.@  When a dispute is not inherently
local, federal law controls the interpretation of a maritime contract.  Norfolk
S. Ry. Co. v. Kirby, 543 U.S. 14, 22B23 (2004) (citing Kossick v.
United Fruit Co., 365 U.S. 731, 735 (1961)).  The determination of whether
an agreement constitutes a maritime contract subject to federal maritime law
depends upon Athe nature and character of the contract@ and whether it has Areference to maritime service or
maritime transactions.@  Id. at 23B24 (quoting N. Pac. S.S. Co. v.
Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125 (1919)). 
Because Aa charter party is a classic example
of a maritime contract,@ federal law governs its interpretation.  See Fontenot v.
Mesa Petroleum Co., 791 F.2d 1207, 1214 (5th Cir. 1986); Novoship (UK)
Ltd. v. Ruperti, 545 F. Supp.2d 328, 332 (S.D.N.Y. 2008) (AThere can be no dispute that the
contracts at issue hereBcharter party contractsBshould be considered maritime
contracts.@).

Federal maritime law Ais an amalgam of traditional common-law rules, modifications
of those rules, and newly created rules.@  E. River S.S. Corp. v.
Transamerica Delaval, Inc., 476 U.S. 858, 865 (1986).  When interpreting a
maritime contract, the general rules of contract construction and
interpretation apply.  See Marine Overseas Servs., Inc. v. Crossocean
Shipping Co., Inc., 791 F.2d 1227, 1234 (5th Cir. 1986).  

B.        The Participation Agreement








  Although the Halifax Charter and the Participation Agreement are part
of the same transaction and therefore are interpreted together,[11]
the rules of construction applicable to each are not necessarily the same.[12] 
The Participation Agreement is the contract by which Rowan committed to sell
the Halifax to the Owners; unlike a charter party, contracts for the sale of a
vessel are not maritime in nature.  See, e.g., Herman Family
Revocable Trust v. Teddy Bear, 254 F.3d 802, 804 (9th Cir. 2001) (stating
that contracts for the sale of a vessel are not maritime in nature); Vrita
Marine Co. Ltd. v. Seagulf Trading LLC, 572 F. Supp. 2d 411, 411 (S.D.N.Y.
2008) (same).  The parties agreed that the Participation Agreement Ashall in all respects be governed by,
and construed in accordance with, the laws of the State of New York applicable
to agreements made and to be performed entirely within such State, including
all matters of construction, validity and performance.@  Although the Owners cite New York
law as well as the law of other jurisdictions in their motion for summary
judgment, the extent to which the parties urge the application of New York law
rather than federal maritime law to various contract provisions is unclear.[13] 
Thus,  we apply the rules of contract construction set forth in federal
maritime law to the Charter=s provisions, and we interpret provisions of the
Participation Agreement in accordance with Texas contract law except to the
extent that the parties have provided sufficient briefing of New York law to
allow us to apply the substantive law of that state.  See Coca-Cola Co. v.
Harmar Bottling Co., 218 S.W.3d 671, 685 (Tex. 2006) (noting that, absent
proof or argument to the contrary, Texas courts generally may presume that the
determinative law of another state is the same as Texas law).

V.  Analysis

A.        AEstimated Residual Value@

It is uncontroverted that the Halifax disappeared when Hurricane Rita
struck the Gulf Coast during the Renewal Term of the Charter.  Under Section 12
of the Charter, the loss triggered Rowan=s obligation to pay the Owners as
follows:

SECTION 12.  Loss, Destruction, Condemnation or Damage.  (a) Payment
of Stipulated Loss Value.  Upon the occurrence of an Event of Loss with
respect to the Vessel, the Charterer shall forthwith . . . give
the Owner Trustee and the Indenture Trustee notice of such Event of Loss and, on
the next succeeding Hire Payment Date 60 days after such occurrence (or, if
earlier, the final scheduled Hire Payment Date) pay to
the . . . Owner Trustee an amount equal to the sum of
(i) Stipulated Loss Value calculated as of such Hire Payment Date,
(ii) . . . Basic Hire due and payable on such Hire Payment
Date and (iii) any other Hire then due and payable.








(emphasis
added).  The next succeeding Hire Payment Date sixty days after the loss fell
on March 15, 2006, and, with the exception of the Hire Payment regularly
scheduled for that date and the Stipulated Loss Value payable as a result of
the loss, the parties do not contend that Aany other Hire [was] then due and
payable.@  Thus, on March 15, 2006, Rowan was
required to pay (1) the Stipulated Loss Value calculated as of that date;
and (2) the Basic Hire due on March 15, 2006.  Rowan does not dispute that the
Basic Hire due on that date was $2,617,489.13.  The parties= disagreement arises from their
differing interpretations of one of the components of AStipulated Loss Value.@  

The Participation Agreement provides that, A>Stipulated Loss Value= as of any date during any Renewal
Term shall mean the amount determined pursuant to Section 18 of the Charter.@  Under section 18 of the Charter,
Stipulated Loss Value on a given Hire Payment Date is defined to equal the sum
of (1) the Basic Hire due on that date, (2) the present value on the Hire
Payment Date of all remaining payments, and (3) the present value on the
Hire Payment Date of the Aestimated residual value.@[14]  The central dispute in this appeal
concerns the meaning of the phrase Aestimated residual value@ as used in section 18(a)(B)(ii)(b)
of the Halifax Charter.

Section 18(a) provides in pertinent part:

SECTION 18(a) Fixed Rental Renewal Option.  

Such Renewal Term shall be for a period that, when
added to the Interim Term and the Basic Term, shall not exceed 80% of the total
estimated remaining economic useful life of the Vessel (measured from the
Closing Date) as determined by the Appraisal Procedure . . .; provided, however,
that 

(A)      at the end of
such Renewal Term the Vessel will have an estimated residual
value . . . as determined in such Appraisal Procedure of
not less than 20% of the Owner=s Cost for the
Vessel and 








(B)      the use of the
Vessel will, as of the beginning of such Renewal Term and as determined in
such Appraisal Procedure, be reasonably expected to be commercially
feasible (in a manner that would permit the Owner Trustee to realize the residual
value described in the foregoing clause (A)) by some Person other than the
Charterer who could charter or purchase the Vessel from the Owner Trustee at
the end of such Renewal Term.  In addition to the limitation set forth in the
next preceding sentence, no Renewal Term pursuant to this paragraph (a) shall
be entered into if it would end before one year after the commencement
thereof.  During such Renewal Term, all of the provisions of this Charter shall
continue in full force and effect, except that 

(ii)       Stipulated Loss Value on each Hire Payment Date during such
Renewal Term shall be equal to the sum of Basic Hire payable on such Date and
the present value as of such Date of (a) Basic Hire that would have been
payable over the balance of such Renewal Term and (b) the estimated
residual value as of the end of such Renewal Term (present value to be
determined by using a discount rate of 10% compounded semiannually) as
determined by the Appraisal Procedure.

(emphasis
added).

Rowan contends that the phrase Aestimated residual value@ is a term of art with a recognized
usage in the tax, accounting, and financial fields and is the estimate made at
the beginning of the lease of the value of the vessel at the end of the lease. 
The Owners contend that Aestimated residual value@ is equal to the fair market value
that the vessel would have commanded at the end of the Renewal Term if the loss
had not occurred.  After analyzing the agreements under the applicable rules of
contract interpretation, we conclude that the interpretation advanced by Rowan
is reasonable, and the interpretation described by the Owners is not.  We
therefore hold that the Halifax Charter is unambiguous and must be interpreted
in the manner described by Rowan.

1.         Intent of the Parties








Charter party agreements are a species of contract, and as such, they are
subject to the general rules of contract law.  Marine Overseas Servs., Inc.,
791 F.2d at 1234.  Like other contracts, maritime contracts must be interpreted
to give effect to each of the contract=s provisions.  Am. Roll-On
Roll-Off Carrier, LLC v. P&O Ports Baltimore, Inc., 479 F.3d 288, 293
(4th Cir. 2007); see also Restatement
(Second) of Contracts: Rules in Aid of Interpretation ' 202(2) (1979) (AA writing is interpreted as a whole,
and all writings that are part of the same transaction are interpreted
together.@).  Our primary purpose in interpreting a maritime contract is to
ascertain the intent of the parties.  F.W.F., Inc. v. Detroit Diesel Corp.,
494 F. Supp. 2d 1342, 1357 (S.D. Fla. 2007).  Thus, we construe a charter Aaccording to the intent of the
parties as manifested by the whole instrument rather than by the literal
meaning of any particular clause taken by itself.@  The Rice Co. (Suisse), S.A. v.
Precious Flowers Ltd., 523 F.3d 528, 534 (5th Cir. 2008) (quoting  The
Framlington Court, 69 F.2d 300, 303 (5th Cir. 1934)); see also F.W.F.,
Inc., 494 F. Supp. 2d at 1357 (AThe elementary canon of
interpretation is, not that particular words may be isolatedly considered, but
that the whole contract must be brought into view and interpreted with
reference to the nature of the obligations between the parties, and the
intention which they have manifested in forming them.@ (quoting O=Brien v. Miller, 168 U.S. 287, 297B300 (1897))); Restatement (Second) of Contracts: Rules in Aid of Interpretation ' 202(1) (1979)  (AWords and other conduct are
interpreted in the light of all the circumstances, and if the principal purpose
of the parties is ascertainable it is given great weight.@).  Contractual provisions are read
in a manner that effectuates the contract=s spirit and purpose, considered as a
whole and interpreted so as to harmonize and give meaning to all of its
provisions.  Arizona v. United States, 575 F.2d 855, 863 (Ct. Cl.
1978).  An interpretation that affords Aa reasonable meaning to all parts
will be preferred to one which leaves a portion of it useless, inexplicable,
inoperative, void, insignificant, meaningless, superfluous, or achieves a weird
and whimsical result.@  Id.  

2.         Plain Language

Whenever possible, we consider the plain language of the contract first. 
Flores v. Am. Seafoods Co., 335 F.3d 904, 910 (9th Cir. 2003).  Unless a
different intention is manifested, we interpret language according to its
generally prevailing meaning.  Restatement
(Second) of Contracts: Rules in Aid of Interpretation '  202(3)(a) (1979).  








In the phrase, Aestimated residual value,@ to Aestimate@ means A[t]o set a value on or appraise,@ A[t]o form an approximate judgment or
opinion regarding the value,=@ or to A>[c]alculate approximately.=@ United States v. Foster, 131
F.2d 3, 7 (8th Cir. 1942).  AValue,@ as used in the context presented here, refers to monetary
worth.  See Webster=s Third New Int=l Dictionary,
2530 (Philip Babcock Gove, ed., 3d ed., 1993).  More specifically, Aresidual value@ is defined as the A[a]mount expected to be obtained when
a fixed asset is disposed of at the end of its useful life (also called scrap
or salvage value).@   Black=s Law Dictionary 1552 (6th ed. 1990).[15] 
Thus, the generally prevailing meaning of the words comprising the phrase Aestimated residual value@ as used in the Operative Documents
suggests an approximate calculation of the monetary value of the vessel at the
end of the lease term under discussion.  This meaning is consistent with Rowan=s argument that Aestimated residual value@ was required to be calculated before
the loss, because after the vessel vanished, its approximate value at the end
of the lease term would be nothing. 

3.         Terms Used Elsewhere in
the Operative Documents 

It is the Owners= position, however, that Aestimated residual value@ is calculated after an event of loss
and is equal to the fair market value that the vessel would have had if the
loss had not occurred.  But every provision of a maritime contract must be read
in light of the others so as to give each the meaning reflected by the contract
as a whole.  Am. River Transp. Co. v. Morton Int=l, Inc., No. 06-6103, 2008 WL 2436176, at *1
(E.D. La. June 13, 2008).  We therefore cannot ignore the fact that the parties
have actually used the terms Afair market value@ and Aresidual value@ elsewhere in the contract to refer
to non-equivalent valuations.[16]  For
example, section 3.01(j) of the Participation Agreement describes the following
conditions precedent:

The Owner Participant shall have
received . . . appraisals by Rush Johnson Associates and
[L]owell [J]ohnston & [A]ssociates, [I]nc., in form and substance
satisfactory to the Owner Participant . . . and dated
the Closing Date, stating in each case:








(i)        such appraiser=s estimate of the fair market value of the Vessel
on the Closing Date, which fair market value shall be equal to $66,500,000;

(ii)       such appraiser=s estimate as of the Closing Date of the remaining
useful life of the Vessel and the residual value thereof at the end of the
Basic Term (without taking into account the effects of inflation or
deflation and costs of removal to the Owner Participant or the Owner Trustee),
which estimates shall be not less than 22 years and not less than 20% of Owner=s Cost for the Vessel,
respectively . . . .

(emphasis
added).  Thus, the Participation Agreement required an initial appraisal of two
different values.  The first figure represented the vessel=s then-current fair market value. 
The second figure was a prediction, made before the lease term began, of the
vessel=s residual value when the lease term
ended sixteen years later.  This section of the Participation Agreement is
noteworthy in that it illustrates that the parties did not use the terms Aestimated residual value@ and Afair market value@ to refer to the same thing.  Rowan=s interpretation of Aestimated residual value@ is consistent with the parties= use of these words elsewhere in the
contract to require an approximate calculation of the vessel=s residual value in the future.  In
contrast, the Owners= interpretation of Aestimated residual value@ requires speculation regarding the
fair market value the vessel would have had if it had survived.

Further, the Owners= interpretation requires the terms Aresidual value@ and Afair market value@ to be used in ways that not only are
inconsistent with the use of these terms elsewhere in the contract, but  which
also render some contract provisions meaningless.  For example, in section
16(b) of the Halifax Charter, the parties agreed that in the event of default, 








[T]he Owner Trustee may, within 30 days after the
Charterer shall make the full payment of Basic Hire and Stipulated Loss Value
as aforesaid, give the Charterer written notice requesting that the Fair Market
Sales Value of the Vessel as of the date as of which Stipulated Loss Value was
determined pursuant to clause (ii) of this Section 16(b) be determined.  If the
Fair Market Sales Value of the Vessel as of such date shall be determined to
exceed the Stipulated Loss Value paid pursuant to the first sentence of this
Section 16(b), the Charterer shall, within 60 days after such determination,
pay the amount of such excess to the Owner Trustee.

 

If, as the
Owners imply, estimated residual value is the same as fair market value, then
this provision is meaningless.  As previously discussed, Stipulated Loss Value
is the sum of  estimated residual value plus the present value of remaining
Basic Hire payments.  If estimated residual value and fair market value are the
same, then Stipulated Loss Value is the sum of fair market value plus the
present value of remaining Basic Hire payments.  Under this interpretation, it
is mathematically impossible for fair market value ever to exceed Stipulated
Loss Value, and this provision of the Charter is superfluous. 

The Owners= interpretation also uses the word Aestimate@ in a manner inconsistent with its
usage elsewhere in the contract.  Although Aestimate@ is used in other provisions to refer
to an approximate calculation based on known information, the Owners= use of the word Aestimated@ in its interpretation of the phrase Aestimated residual value@ requires an appraiser to calculate
the fair market value of the vessel at the end of the lease term based on an
assumptionCthe continued existence of the vesselCthat is known to be false. 

4.         Rule of the Last
Antecedent








Under the grammatical Arule of the last antecedent,@ Aqualifying words, phrases, and
clauses@ are to be applied only to the
immediately preceding words or phrase[17] and Aare not to be construed as extending
to and including others more remote.@  Elliot Coal Mining Co., Inc. v.
Dir., Office of Workers= Comp. Programs,  17 F.3d 616, 629B30 (3d Cir. 1994) (quoting Azure
v. Morton, 514 F.2d 897, 900 (9th Cir.1975)).  Pursuant to section
18(a)(B)(ii)(b) of the Charter, one component of Stipulated Loss Value is Athe estimated residual value as of
the end of such Renewal Term (present value to be determined by using a
discount rate of 10% compounded semiannually) as determined by the Appraisal
Procedure.@  Applying the rule of the last antecedent to this language, the phrase Aas determined by the Appraisal
Procedure@ does not modify Aestimated residual value@ as the Owners contend, but instead
modifies Asuch Renewal Term.@[18]

5.         Absurd Result








The unreasonableness of the Owners= interpretation is further
illustrated by the  inconsistent ways in which it deals with the effect of the
hurricane on supply, demand, and value.  The destruction of the Halifax and
similar rigs decreased the supply of such vessels.  ConsequentlyCand as stated by the Owners= own appraisersCdemand for such vessels after the
hurricane exceeded supply.[19]  Because
demand exceeded supply, the market price for such vessels increased.  See
United States v. Cors, 337 U.S. 325, 333B34 (1949) (discussing analogous
situation in which government demand for vessels in a time of national
emergency outstrips supply, resulting in inflated prices for vessels and
causing the market to be an unfair indication of value).  Thus, when estimating
the fair market value that a vessel such as the Halifax would have had at the
end of the Renewal Term had it survived, the appraisers used market prices that
were based in part on the destruction of the Halifax, among others.  In effect,
the Owners urge an interpretation that accounts for the effect of the hurricane
on the market but ignores its effect on the rig.  Instead of acknowledging the
destruction of the vessel as a cause of decreased supply, the Owners treat the
Halifax as the beneficiary of increased demand.  This interpretation reaches an
absurd result in which the destruction of the Halifax increased its value.  In
addition, it highlights another barrier to this interpretation: the absence of
shared assumptions.

6.         No Shared Assumptions for
a Post-Loss Appraisal 








The Operative Documents provide no set of shared assumptions on which a
post-loss appraisal could be based.  For example, Section 7(a)(ii) of the
Charter requires the Charterer to Akeep the Vessel in such condition as
will entitle her to the highest classification and rating by the American
Bureau of Shipping for vessels of the same age, type and
use . . . .@  This obligation does not apply Aduring such period
as . . . an Event of Loss shall have occurred and be
continuing . . . .@  Charter, ' 7(a)(y).  Thus, there is no
agreement concerning the hypothetical condition of the vessel at the time of a
post-loss appraisal.  Nevertheless, the appraisers retained by the Owners used
the assumption that the vessel was in the highest classification rating,
despite the explicit contract provision that this assumption does not apply to
an Event of Loss.  As a result, their opinions concern a hypothetical rig that
not only survived the hurricane, but did so without significant damage.  The
absurdity of this result further illustrates that if the parties intended to
permit the Appraisal Procedure to be invoked after a loss, they would have
eliminated the exception in section 7(a)(y) of the Charter or otherwise agreed
upon the assumptions they would apply regarding the vessel=s hypothetical condition after its
loss.[20]  

B.        Timing of Appraisal Procedure

As the foregoing discussion demonstrates, the Operative Documents  do not
support an interpretation that the parties intended estimated residual value to
be based on a post-loss appraisal.  A close reading of these documents also
demonstrates that the parties did not intend for the Appraisal Procedure to be
invoked after the Renewal Term began.

1.         Plain Language 








As previously indicated, the parties agreed that the length of the
Renewal Term would be determined by the Appraisal Procedure.  In section
18(a)(A) and 18(a)(B) of the Charter, the parties agreed that Aat the end of such Renewal
Term the Vessel will have an estimated residual
value . . . as determined in such Appraisal
Procedure of not less than 20% of the Owner=s Cost for the Vessel
and . . .  the use of the Vessel will, as of the
beginning of such Renewal Term and as determined in such
Appraisal Procedure, be reasonably expected to be commercially
feasible . . . .@ (emphasis added).  The use of the
word Asuch@ indicates that the length of the
Renewal Term and the minimum estimated residual value are determined from the
same Appraisal Procedure.[21]  Similarly,
in section 18(a)(B)(ii)(b), the Stipulated Loss Value on each Payment Hire Date
during the Renewal Term includes Athe estimated residual value as of
the end of such Renewal Term . . . as determined by
the Appraisal Procedure.@ (emphasis added).  This is the same Appraisal Procedure
referred to earlier in section 18, i.e., the Appraisal Procedure utilized to
determine both the length of the Renewal Term and to ascertain whether the 
minimum estimated residual value is at least twenty percent of the Owners= Cost.

As expressed in the language of section 18(a), the parties contemplated
the use of a single Appraisal Procedure, which would determine (1) the
vessel=s remaining useful life measured from
the Closing Date (i.e., the period used to determine the length of the Renewal
Term), and (2) whether the estimated residual value was at least twenty percent
of the Owners= Cost of $66.5 millionCi.e., $13.3 million.  Specifically, the Appraisal Procedure
was to be used to calculate the Renewal Term within a range of one to
seven-and-one-half years.  The parties intended that the Renewal Term be
determined before it began, and there is no indication in the Operative
Documents that the length of the Renewal Term could be varied during the term
as initially agreed upon by the parties.  Thus, unless AAppraisal Procedure@ means different things in different
sentences of the same contract provision, then the Appraisal Procedure was
intended to be used before the start of the Renewal Term to determine its
length.  Moreover, section 18(a) requires an appraiser to certify that the estimated
residual value at the end of the Renewal Term will be at least $13.3 million. 
Significantly, this section  contains no language requiring or permitting the
adjustment of the estimated residual value.

The Owners= interpretation, however, requires us to ignore the word Asuch@ and disconnect the determination of
the Vessel=s remaining useful life from the determination that the minimum estimated
residual value is at least $13.3 million.  Because this interpretation would
render the word Asuch@ meaningless, we cannot adopt this view.  








2.         AAppraisal Procedure@ Defined

The contractual definition of AAppraisal Procedure@ also supports Rowan=s interpretation.  In Appendix A of
the Participation Agreement, AAppraisal Procedure@ is defined as follows:

AAppraisal Procedure@ shall mean the procedure specified in the succeeding
sentences for determining an amount, value or period.  If the Owner Trustee and
the Charterer shall have been unable to agree on such amount, value or
period, and if either the Owner Trustee or the Charterer shall give written
notice to the other requesting determination of such amount, value or period by
appraisal, the Owner Trustee and the Charterer shall consult for the purpose of
appointing a mutually acceptable qualified independent appraiser, who shall be
a marine surveyor.  If such parties shall be unable to agree on an appraiser
within 20 days of the giving of such notice, such amount or value shall be
determined by a panel of three independent appraisers, each of whom shall be a
marine surveyor. 

(emphasis
added).








The parties= rights to request appraisal is subject to the condition
precedent that the parties Ashall have been@ unable to agree.  In determining the
meaning of this phrase, we apply normal grammatical rules.  AShall have been@ is the future perfect continuous
tense, Aused to express a continuous, ongoing
action which will be completed by a certain time in the future.@[22]  Here, it cannot be said that there
was a continuous, ongoing failure to agree.  To the contrary, the parties
entered the contract and performed for 21 yearsCthroughout the remaining existence of
the rigCwithout any expression of
disagreement regarding the variables required to be determined pursuant to
section 18(a).  Although the Owners essentially contend that they may
require a formal appraisal if the parties become unable to agree, this
is not what is stated in the definition provided by the Operative Documents.[23]

3.         Adjustment of Stipulated
Loss Value

The Operative Documents also provide that Stipulated Loss Value Ashall be adjusted as required in
Article IX of the Participation Agreement.@ Article IX of the Participation
Agreement sets forth conditions under which Basic Hire, Stipulated Loss Value,
and Termination Value are to be recalculated.  These conditions consist of (i)
a change in the Closing Date, (ii) an increase in the Owner=s transaction costs, and
(iii) changes in the tax law.  Notably, the occurrence of an AEvent of Loss@ or changes in the market are not
listed among those conditions that necessitate or permit a mid-term adjustment
to Stipulated Loss Value.

4.         Generally Accepted
Accounting Principles








It has been said that, under general maritime law, a court may not look
beyond the written language of the document to determine the intent of the
parties unless the disputed contract provision is ambiguous.  Corbitt v.
Diamond M. Drilling Co., 654 F.2d 329, 332B33 (5th Cir. 1981).[24] 
Although this is essentially a statement regarding the parol evidence rule, it
excludes Aonly evidence of prior understandings and negotiations which contradicts
the unambiguous meaning of a writing which completely and accurately integrates
the agreement of the parties.@  Battery S. S. Corp. v. Refineria Panama, S. A., 513
F.2d 735, 739B40 (2d Cir. 1975).  Conversely, when extrinsic evidence is considered for
the purpose of interpretation, the parol evidence rule is inoperative.  Garza
v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988).  Having
concluded that the unambiguous language of the Operative Documents demonstrates
the intent of the parties to use the Appraisal Procedure not later than the
start of the Renewal TermCand only if they have been unable to agree on an amount,
value, or periodCwe further note that this conclusion is consistent with, but
not dictated by, generally accepted accounting principles (AGAAP@).  








GAAP A>encompass[] the conventions, rules, and procedures
that define accepted accounting practice at a particular point in time.=@ Shalala v. Guernsey Mem=l Hosp., 514 U.S. 87, 101 (1995).  Foremost
among the sources informing GAAP is the Financial Accounting Standards Board (AFASB@), a private organization founded at
the recommendation of the American Institute of Certified Public Accountants to
establish accounting principles.  Statement of Policy on the Establishment and
Improvement of Accounting Principles, SEC Release No. AS-150, 1973 WL 149263,
at *1 (Dec. 20, 1973).  The Aprinciples, standards and practices promulgated by the FASB
in its Statements and Interpretations@ are considered by the Securities
& Exchange Commission Aas having substantial authoritative support, and those
contrary to such FASB promulgations [are] considered to
have no such support.@  Id.

FASB Statement No. 13 addresses the accounting treatment of estimated
residual value in leasing transactions and provides that estimated residual
value is determined at the inception of the lease (or in some instances, at the
renewal of the lease).  Fin. Accounting
Standards Bd., Statement of Fin. Accounting Standards No. 13 (AFASB 13@), & 17 (2008).  This accounting
standard further provides that A[a]n upward adjustment of the estimated residual value shall
not be made.@  Id. 

The Owners argue that the provisions of FASB 13 are applicable only to
accounting.  For example, paragraph 43 of FASB 13 describes generally accepted
accounting principles concerning the method by which a lessor in a leveraged
lease accounts for that investment.  The calculation of the lessor=s investment includes the estimated
residual value of the leased asset.  FASB 13 & 43(c).  Except in circumstances not
presented here, however, A[t]he estimated residual value shall not exceed the amount
estimated at the inception of the lease.@  Id.  The same restriction
applies to the accounting of a lessor=s investment in a Asales-type lease@ and a Adirect financing lease.@  See FASB 13 && 17(a), (d); 18(a), (d).  According
to the Owners, these restrictions imply that the estimated residual value can
increase, but simply prevent the lessor from recognizing a gain on the
investment before it actually receives the money.  








This argument ignores the distinction between estimated residual
value and actual residual value.  Significantly, the parties entered the
Participation Agreement with the express understanding that estimated residual
value and actual residual value are not the same.  Moreover, the parties agreed
in section 8.03(b) of the Participation Agreement that Rowan did not guarantee
the actual residual value of the Vessel.[25] 
Thus, Rowan correctly asserts that the A$13,300,000 figure remains the number
that should be used in the formula for calculating what Rowan owes.@

By setting a time limit for invoking the Appraisal Procedure, the parties
have allocated the risk of market fluctuations.  If the Owners believed that
the estimated residual value of the vessel would increase over time, they could
have invoked the Appraisal Procedure at the outset of the contract.  By failing
to do so, they bore the risk that they would lose value if the estimated
residual value rose.  This is consistent with economic reality: if the vessel
remained in existence at the end of the lease so that its actual residual value
could be realized, then the Owners would bear the loss if its actual value was
less than estimated and would reap the gain if its value increased. 
Conversely, if Rowan believed that the rig=s estimated residual value would be
less than $13.3 million, it could have invoked the Appraisal Procedure.  By
failing to do so, it bore the risk that it might pay more than the rig=s residual value in the event of a
loss, but it obtained the benefit of a locking in a Aceiling@ for the vessel=s stipulated loss value.[26]








We conclude that the previously agreed-upon estimated residual value of
$13.3 million was not changed by the Owners= invalid invocation of the Appraisal
Procedure after the loss.  Even if the 2000 amendment to the Operative
Documents contemplated a second AAppraisal Procedure,@ the intention of the parties as
expressed in section 18(a) does not encompass a post-casualty appraisal.  At
most, the parties indicated that the appraisal be performed at the start of the
Renewal Term as part of the process of determining the length of the Renewal
Term.  Nothing in the Operative Documents allows backdating of estimated
residual value as the Owners suggest.  Although the Owners further argue that
they agreed to use the Appraisal Procedure to calculate estimated residual
value Aif and when there was a need to
calculate SLV during the Renewal Term,@ the need to calculate Stipulated
Loss Value was not a mere contingency; rather, it was necessary to calculate
Stipulated Loss Value from the start of each term in order for Rowan to ascertain
its insurance obligations.  Moreover, under the Owners= model, it cannot be determined if or
when Rowan breached the contract by under-insuring. 

C.        Calculation of Amount Owed by Rowan

The amount Rowan owed in the Event of Loss is set forth in Section 12(a)
of the Charter: on the next succeeding Hire Payment Date 60 days after the
Loss, Rowan was required to pay to Wilmington, as the Owner Trustee, an amount
equal to the sum of the Basic Hire due on that date and Stipulated Loss Value. 
Stipulated Loss Value on a given payment date is defined to equal the Basic
Hire due on that date plus the present value of all remaining payments, plus
the present value of the estimated residual value.  

On appeal, Rowan challenged only substitution of the estimated residual
value of over $80 million as calculated by the Owners rather than the
previously agreed-upon estimated residual value of $13.3. million.  We agree
that the trial court erred in substituting the post-loss figure suggested by
the Owners rather than the previously agreed-upon figure; however, we are
unable to simply render judgment.  See Tex.
R. App. P. 43.3(a) (AWhen reversing a trial court=s judgment, the court must render the
judgment that the trial court should have rendered, except when . . . a remand
is necessary for further proceedings . . . .@).  Because the trial court concluded
that the insurance proceeds that Rowan deposited in an escrow account were
insufficient to meet Rowan=s obligations to the Owners, it did not reach the question of
the proper disposition of excess insurance funds.  

D.        Excess Insurance Proceeds








Insurance proceeds in excess of the amount that Rowan is required to pay
pursuant to Section 12(b)(i) of the contract are to be divided between parties Aas their interests may appear,@ but the Operative Documents provide
no description of the means by which the parties= interests are to be determined.  We
therefore remand the question of the method intended by the parties to be used
in making this determination, for calculation of the total amount Rowan is
required to pay to Wilmington, and for determination of the parties= respective rights to excess
insurance proceeds.[27] 








Although the Owners argue on appeal that ARowan had no evidence of any
insurable interest of its own in the Halifax hull and equipment,@ the Owners did not pursue a
no-evidence summary judgment or argue that there was no such evidence.  In
their traditional motion for summary judgment, the Owners merely asserted that ARowan has refused to identify
any insurable interest of its own in the Halifax hull and equipment.@  The Owners do not contend that
Rowan lacked an insurable interest, or even lacked evidence of an insurable
interest, and the foregoing is not properly characterized as an express ground
for traditional or no-evidence summary judgment

E.        Attorneys= Fees  

Attorneys= fees were awarded pursuant to the parties= stipulation that appellees= reasonable and necessary attorney
fees for the breach-of-contract action total $500,000.  Rowan did not challenge
this award in its appellate brief, or assert error regarding the amount of fees
at any time prior to its reply brief.  Although Rowan reserved the right to
challenge appellees= entitlement to attorneys= fees, it did not reserve the right
to challenge the amount.

On appeal, Rowan cites Barker v. Eckman as authority for reversing
and remanding the attorneys= fee award.  213 S.W.3d 306, 312B15 (Tex. 2006).  In Barker,
the Texas Supreme Court concluded that the appellate court could not conduct a
proper factual sufficiency review because the jury=s award of attorneys= fee was tied to an inflated damage
finding.  Id. at 314B15.  Here, however, the parties have stipulated to the proper
amount of the  Owners= attorneys= fees.  Under these circumstances, we are reasonably certain
that the trial court=s award of attorneys= fees was not significantly
influenced by the erroneous amount of damages it considered, but was instead a
result of the parties= stipulation.  Because we conclude that the Owners correctly
asserted that Rowan owed additional funds, albeit in a much lesser amount, we
affirm the trial court=s award of attorneys= fees.

V. 
Conclusion








 Pursuant to the unambiguous terms of the Operative Documents, the Owners
were not entitled to recalculation of  the estimated residual value  based on a
post-loss appraisal.  We therefore reverse the trial court=s judgment and remand for
determination of (1) the amount owed by Rowan based upon the Halifax=s estimated residual value of $13.3
million, (2) the disposition of excess insurance funds, and (3) applicable
pre-judgment and post-judgment interest based upon the corrected amounts. 
Because the amount of attorneys= fees to be awarded was based upon the parties= stipulation, we affirm the award of
attorneys= fees.

 

 

 

 

/s/        Eva M. Guzman

Justice

 

Panel
consists of Justices Frost, Seymore, and Guzman. (Frost, J. dissenting)








APPENDIX

The key
provisions of the Participation Agreement are as follows:

Article III      CONDITIONS PRECEDENT

SECTION 3.01.  Conditions
Precedent to Participations in Owner=s Cost.  The obligation of
each Participant on the Closing Date to participate in the payment of Owner=s Cost shall be subject to the fulfillment to the
satisfaction of, or waiver by, each Participant prior to or on the Closing
Date, of the following conditions precedent . . . :

. . .

(j)        Appraisers= Certificates.
The Owner Participant shall have received . . . appraisals
by Rush Johnson Associates and [L]owell [J]ohnston & [A]ssociates, [I]nc.,
in form and substance satisfactory to the Owner
Participant . . . and dated the Closing Date, stating in
each case:

(i)        such appraiser=s estimate of the fair market value of the Vessel on
the Closing Date, which fair market value shall be equal to $66,500,000;

(ii)       such appraiser=s estimate as of the Closing Date of the remaining
useful life of the Vessel and the residual value thereof at the end of the
Basic Term (without taking into account the effects of inflation or deflation
and costs of removal to the Owner Participant or the Owner Trustee), which
estimates shall be not less than 22 years and not less than 20% of Owner=s Cost for the Vessel, respectively; and

(iii)     that the Vessel does not constitute Alimited use property@ as that term is used in Rev. Proc.
76-30.

SECTION 3.02.  Conditions Precedent to Obligations
of Charterer.  The obligations of the Charterer to sell the Vessel to the
Owner Trustee, and to charter the Vessel from the Owner Trustee on the Closing
Date and to carry out its other obligations under the Operative
Documents . . . shall be subject to the performance by each
of the other parties hereto of their respective obligations
hereunder . . . and the fulfillment to the satisfaction of,
or waiver by, the Charterer on or prior to the Closing Date, of the following
additional conditions precedent:

. . .








(c)       Other Documents.  The Owner Participant shall have
received the appraisals referred to in Section
3.01(j) . . . 

SECTION 8.03.  Representations, Warranties and
Covenants of the Charterer.  The Charterer represents to, and warrants and covenants
for the benefit of, the Owner Participant that:

. . .

(b)       Useful Life,
etc.  (i) The period consisting of the Interim Term and the Basic Term
is not greater than 80% of the estimated remaining useful life of the Vessel
(measured from the Closing Date), (ii) the estimated fair market value of
the Vessel at the expiration of the Basic Term is equal to at least 20% of
Owner=s Cost, without including in such value any increase
or decrease for inflation or deflation and after subtracting from such value
any estimated cost to the Owner Trustee or the Owner Participant for removal
and delivery of possession of the Vessel to the Owner Participant at the end of
such period, (iii) it is reasonable to expect that the Vessel will be
useful and usable by a party other than the Charterer or any person related to
the Charterer at the end of the Basic Term and any Renewal Term and capable of
continued leasing or transfer to another party at that time and that it will be
commercially feasible to do so such that the Vessel is not and will not be Alimited use property@ within the meaning of Revenue Procedure 76-30 as modified to the
Closing Date, (iv) Owner=s Cost is equal
to the fair market value of the Vessel on the Closing Date and (v) the
estimated remaining useful life of the Vessel (measured from the Closing Date)
is 22 years; provided, however, that nothing contained in this
Section 8.03(b) shall constitute a guarantee of the actual useful life or
residual value of the Vessel.[[28]]

 

Article IX      RECOMPUTATION OF BASIC RENT, STIPULATED LOSS VALUE AND
TERMINATION VALUE








SECTION 9.02.  Stipulated
Loss Value; Termination Value.  At the time any adjustment of Basic Hire
percentages shall be required under this Article IX or under Section 8.09, the
Stipulated Loss Value and Termination Value percentages specified in Schedules
A and B annexed to the Charter shall be adjusted by the Owner Participant,
effective as of the first Hire Payment Date thereafter; provided, however,
that Stipulated Loss Value and Termination Value percentages shall not be
reduced below those percentages that will produce Stipulated Loss Value or
Termination Value as of any Hire Payment Date until expiration of the Basic
Term (taken together with any Interim Hire or Basic Hire payable on such Hire
Payment Date) at least equal to the principal amount of, and interest on the
Bonds outstanding on the Hire Payment Date to which such payment of Stipulated
Loss Value or Termination Value, as the case may be, relates.

 

SECTION 9.03.  Computation
of Adjustments.  Upon the occurrence of an event requiring an adjustment to
any Basic Hire, Stipulated Loss Value or Termination Value percentages pursuant
to this Article IX or under Section 8.08,[[29]]
the Owner Participant shall make the necessary computations and, within
90 days of the Owner Participant=s
knowledge of such event, furnish to the Charterer (with a copy to the Indenture
Trustee) a certificate of the Owner Participant setting forth the amount of any
increase or decrease in such percentages and the computation of such amounts. 
If the Charterer shall disagree with any such amounts, they shall be reviewed
and determined by an independent accounting firm jointly chosen by the Owner
Participant and the Charterer or, in the absence of agreement as to such firm,
by a third independent accounting firm jointly chosen by two independent
accounting firms, one chosen by the Owner Participant and one chosen by the
Charterer.  The costs of such verification shall be borne by the Charterer.

 

Appendix A   DEFINITIONS
RELATING TO THE PARTICIPATION AGREEMENT, CHARTER, INDENTURE AND TRUST AGREEMENT
REFERRED TO BELOW            

 








AAppraisal Procedure@ shall mean the procedure specified in the succeeding sentences for
determining an amount, value or period.  If the Owner Trustee and the Charterer
shall have been unable to agree on such amount, value or period, and if either
the Owner Trustee or the Charterer shall give written notice to the other
requesting determination of such amount, value or period by appraisal, the
Owner Trustee and the Charterer shall consult for the purpose of appointing a
mutually acceptable qualified independent appraiser, who shall be a marine
surveyor.  If such parties shall be unable to agree on an appraiser within 20
days of the giving of such notice, such amount or value shall be determined by
a panel of three independent appraisers, each of whom shall be a marine
surveyor.  One of such appraisers shall be selected by the Charterer and
another shall be selected by the Owner Trustee; provided, however,
that if either the Charterer or the Owner Trustee shall fail to select an
appraiser within 30 days after the giving of such notice, such appraiser shall
be selected by the other party.  The two appraisers selected as aforesaid shall
select the third appraiser or, if they shall be unable to agree on a third
appraiser within 10 days after each of such two appraisers shall have been
selected, such third appraiser shall be selected by the American Arbitration
Association (or its successors).  The appraiser or appraisers appointed
pursuant to the foregoing procedure shall be instructed to determine such
amount, value or period within 45 days after such appointment and such
determination shall be final and binding upon the parties.  If three appraisers
shall be appointed, the determination of the appraiser that shall differ most
from the second highest determination of all three appraisers shall be
excluded, the remaining two determinations shall be averaged and such average
shall constitute the determination of the appraisers.  The fees and expenses of
the appraiser appointed by the Charterer shall be paid by the Charterer, the
fees and expenses of the appraiser appointed by the Owner Trustee shall be paid
by the Owner Trustee and the fees and expenses of the third appraiser shall be
divided equally between the Charterer and the Owner Trustee, except that all
fees and expenses of all the appraisers shall be paid by the Charterer in the
case of an appraisal or determination under Section 16 of the Charter.

 

AEvent of Loss
shall mean any of the following events:

. . .

(d) the loss or disappearance
of the Vessel, whether or not covered by insurance . . . .

 








AFair Market Sales Value@ shall mean, as to the Vessel or any other property,
the fair market sales value thereof that would be obtained in an arm=s-length transaction between an informed and willing
buyer and an informed and willing seller, under no compulsion, respectively, to
buy or sell.

 

AHire Payment Dates@ (a) for the Interim Term shall mean the first day of the Basic
term, (b) for the Basic Term shall mean the six-month anniversaries of the
commencement of the Basic Term occurring in March and September of each year
after commencement of the Basic Term and (c) for any Renewal Term shall
mean the sixth-month anniversary of the first day of such Renewal Term, each
sixth-month anniversary thereafter during such Renewal Term and, if not such an
anniversary, the last day of such Renewal Term.

 

AInterim Hire@
shall mean the charter hire payable pursuant to Section 4(b) of the Charter.

 

AInterim Term@
shall mean the period commencing on the Closing Date and ending on March 14,
1985, or such shorter period as may result from earlier termination of the
Charter as provided herein.

 

Owner Participant@ shall mean Textron Financial Corporation, a Delaware
corporation, and shall also include any Person to which such corporation (or
any successor) shall transfer its right, title and interest in and to the
Vessel and the Operative Documents in accordance with Section 11.01 of the
Participation Agreement.

 

AOwner=s Cost@ shall mean $66,500,000.

 

ARenewal Term@
shall mean each of the periods after the end of the Basic Term with respect to
which the Charterer shall exercise its option to renew the Charter pursuant to
Section 18 of the Charter, or such shorter period as may result from the
termination of the Charter as provided herein.

 








AStipulated Loss Value@ as of any date during the Interim
Term or the Basic Term shall mean an amount equal to the product of [the] Owner=s Cost multiplied by the percentage
set forth in Schedule A to the Charter opposite the applicable Hire Payment
Date specified therein.  AStipulated Loss Value@ as of any date during any Renewal
Term shall mean the amount determined pursuant to Section 18 of the Charter. 
Stipulated Loss Value shall be adjusted as required in Article IX of the
Participation Agreement.  Notwithstanding anything in the Charter (including
Schedule A thereto) or in any other Operative Document to the contrary,
Stipulated Loss Value as of any Hire Payment Date shall be, under any
circumstances and in any event, in a sum at least sufficient, together with the
Interim Hire or Basic Hire payable on such Hire Payment Date, to pay an amount
equal to the principal of and interest on all Bonds then outstanding.            

ASupplemental Hire@ shall mean any and all amounts,
liabilities and obligations other than Interim Hire or Basic Hire that the
Charterer assumes or agrees to pay under any Operative Document, including,
without limitation, payments of Stipulated Loss Value, Fair Market Sales Value
and Termination Value and any damages for breach of any covenants,
representations, warranties or agreements therein, to any Participant, the
Owner Trustee or the Indenture Trustee.    

B.        The Bareboat Charter

As an Owner Participant under the Participation Agreement, Textron
executed a Trust Agreement with Wilmington.  Rowan transferred title to the rig
to Wilmington using a written bill of sale, then chartered the rig from
Wilmington pursuant to a Bareboat Charter dated December 1, 1984.  The key
provisions of the Bareboat Charter are as follows:

 

SECTION 6.  Amended by
Assumption & Assignment of Participation Agreement, July 14, 2000.

 








SECTION 7.  Operations and
Maintenance; Compliance with Law; Alterations, Modifications and Additions. 
(a)  Operation and Maintenance.  The Charterer shall have full 
responsibility for possession, use, operation, maintenance and repair of the
Vessel throughout the Charter Term and until redelivery thereof.  Except during
such period as (y)[sic] an Event of Loss shall have occurred and be continuing,
or (z) [sic] there has been any other loss or damage with respect to the Vessel
and the Charterer shall not have had a reasonable time to repair the same (the
Charterer hereby agreeing to diligently repair the same), the Charterer shall,
at its own cost and expense (whether or not any applicable insurance proceeds
are adequate for the purpose); (i) maintain and preserve the Vessel and
her drilling and other equipment in good running order and repair, so that the
Vessel shall be, insofar as due diligence can make her so, tight, staunch,
strong and well and sufficiently tackled, separated, furnished, equipped and in
every respect seaworthy and in as good operating condition as when delivered
hereunder, ordinary wear and tear excepted, and in any event in the condition,
running order and repair which equals or exceeds industry standards and the
condition, running order and repair of other vessels and rigs and their
equipment owned or leased by the Charterer of like kind and age, (ii) keep
the Vessel in such condition as will entitle her to the highest classification
and rating by the American Bureau of Shipping for vessels of the same age, type
and use, (iii) cause the Vessel to meet all requirements of Applicable
Laws . . . (iv) cause the Vessel to be overhauled when
necessary or appropriate and to be dry-docked, cleaned and bottom-painted when
necessary . . . , and (v) maintain the Vessel as
required by manufacturers= warranties and outstanding insurance policies.

 

SECTION 8.  DELETED BY
ASSUMPTION & ASSIGNMENT OF PARTICIPATION AGREEMENT, July 14, 2000

 













SECTION 9.  Insurance. 
(a) Insurance Against Loss or Damage to the Vessel.  The Charterer shall
maintain in effect, at its own expense, Aall-risk@ hull insurance covering the Vessel, in an aggregate
amount of not less than the greater of (i) the Stipulated Loss Value as of
the last preceding Basic Hire Payment Date (or during the period from and
including the Closing Date[[30]] to and
including the first Basic Hire Date, as of the first Basic Hire Payment Date)
(the ASLV Amount@)
and (ii) such amount as shall be sufficient to prevent the Charterer, the Owner
Trustee, the Indenture Trustee,[[31]] any Participant or
any Holder from being a coinsurer of any loss under the applicable insurance
policies,[[32]] with
deductibles not in excess of $500,000.  Such insurance shall cover marine
perils (but need not cover war risk except as set forth in Section 9(j)) on
hull and machinery, and the policy or policies of insurance shall be placed
through independent brokers of good standing and shall be issued by responsible
underwriters reasonably acceptable to the Owner Participant, shall be
maintained in the broadest forms available in either the American or British insurance
markets, shall otherwise contain conditions, terms; stipulations and insurance
covenants reasonably satisfactory to the Owner Participant, and shall be kept
in full force and effect by the Charterer at all times during the Charter Term;
provided that, so long as the Charterer=s Stockholders= Equity is at least $400,000,000, the Charterer may
self-insure up to the excess of the SLV Amount over $55,000,000; and provided
further, however, that unless and until an Event of Loss shall occur
with respect to the Vessel, the Charterer shall promptly and fully repair all
damage to the Vessel and shall pay all salvage and other charges with respect
to such damage, whether or not any insurance is maintained by the Charterer
with respect to the loss resulting from such damage.  The Charterer shall not
put into effect or materially change any such self-insurance arrangement unless
it shall have notified the Owner Trustee, the Indenture Trustee and each
Participant of the details of such arrangement or change and the Charterer
shall have furnished to the Owner Participant and the Indenture Trustee such
evidence as shall be reasonably satisfactory to the Owner Participant and the
Indenture Trustee that such arrangement or change shall not result in any
coinsurance penalty.

. . .

(k)       Additional
Insurance.  The Owner Trustee, the Owner Participant or the Indenture
Trustee may, at its expense, obtain any additional insurance covering the
Vessel or covering any interests of the Owner Trustee, the Indenture Trustee or
any Participant, as the case may be, with respect to the Vessel as it may in
its discretion deem appropriate; provided that no such Person shall
purchase any such insurance that would void, impair or reduce the coverages of
the insurance required to be maintained by the Charterer pursuant to this
Section 9.  Any such insurance shall not be governed by any other provision of
this Charter, the Indenture or the Mortgage, including without limitation as to
policy provisions and payment of proceeds.

 

SECTION 12.  Loss,
Destruction, Condemnation or Damage.  (a) Payment of Stipulated
Loss Value.  Upon the occurrence of an Event of Loss with respect to the
Vessel, the Charterer shall forthwith (and, in any event, within five Business
Days of such occurrence) give the Owner Trustee and the Indenture Trustee
notice of such Event of Loss and, on the next succeeding Hire Payment Date 60
days after such occurrence (or, if earlier, the final scheduled Hire Payment
Date) pay to the Indenture Trustee so long as the Indenture is in effect and
thereafter to the Owner Trustee an amount equal to the sum of (i) Stipulated
Loss Value calculated as of such Hire Payment Date, (ii) Interim Hire or
Basic Hire due and payable on such Hire Payment Date and (iii) any other
Hire then due and payable.  Nothing in this Section 12 shall relieve the
Charterer from its obligation to pay Interim Hire or Basic Hire on any Hire
Payment Date occurring prior to or on the date on which Stipulated Loss Value
shall be payable.

Upon payment in full of all
amounts due pursuant to the preceding paragraph and provided no Charter Default
shall have occurred and be continuing, the Owner Trustee shall transfer
(without any representation, warranty or recourse whatsoever except the absence
of Owner=s Liens) the Vessel to the Charterer by instruments
reasonably satisfactory in form and substance to the Charterer, the obligation
of the Charterer to pay Interim Hire and Basic Hire shall terminate, the Vessel
shall no longer be subject to this Charter and the Charter Term shall end.








(b) Application of Payments
upon an Event of Loss.  Subject to the provisions of Section 12(d), any
payments received at any time by the Owner Trustee or by the Charterer with
respect to the Vessel (including insurance proceeds from insurance carried by
the Charterer) from any governmental authority or other Person as a result of
the occurrence of an Event of Loss shall be applied as follows:

(i) so much of such payments as shall not exceed
all amounts required to be paid by the Charterer pursuant to Section 12(a)(i)
or (ii) shall, for so long as the Indenture shall be in effect, be paid to the
Indenture Trustee (or, if the Indenture shall not be in effect, to the Owner
Trustee) and, to the extent so paid, shall be a credit against (or, if the
Indenture shall not be in effect, be applied in reduction of) the Charterer=s obligation to pay such amounts if not already paid
by the Charterer, or if already paid by the Charterer, shall be applied to
reimburse the Charterer for its payment of such amounts, and 

(ii) the balance, if any, of such payments remaining
thereafter, shall be divided between the Owner Trustee and the Charterer as
their interests may appear.

Upon payment in full of all amounts due pursuant to
Section 12(a) and provided no Charter Default shall have occurred and be
continuing, the Charterer shall, to the extent of its payment pursuant to
Section 12(a)(i), be subrogated to any rights of the Owner Trustee arising
solely out of such Event of Loss.

 

SECTION 15.  Charter Events
of Default.  The following events shall constitute Charter Events of
Default (whether any such event shall be voluntary or involuntary or come about
or be effected by operation of law or pursuant to or in compliance with any
judgment, decree or order of any court or any order, rule or regulation of any
administrative or governmental body:

(a)       the Charterer shall
fail to make any payment of Interim Hire, Basic Hire, Termination Value or
Stipulated Loss Value within the earlier of (i)            five days after the
same shall have become due or 

(ii)       two days after
written notice by personal delivery, telex or other written communication
 . . . ; or

(b)       the Charterer shall
fail to make any other payment of Supplemental Hire . . . .








(c)       the Charterer shall
fail to carry and maintain insurance on or with respect to the Vessel in
compliance with the provisions of Section 9 hereof, or shall otherwise fail to
comply with its obligations set forth in Section 9(i)
hereof . . . .

 

SECTION 16.  Remedies. 
Upon the occurrence of any Event of Default and at any time thereafter so long
as the same shall be continuing, the Owner Trustee may, at its option, by
notice to the Charterer . . . , declare this Charter to be
in default, and at any time thereafter the Owner Trustee may do one or more of
the following as the Owner Trustee in its sole discretion shall elect, to the
extent permitted by, and subject to compliance with the mandatory requirements
of, all Applicable Laws then in effect:

. . .








(b)       the Owner Trustee,
by notice to the Charterer specifying a payment date not earlier than ten days
nor more than 30 days from the date of such notice, may require the Charterer
to pay to the Owner Trustee, and the Charterer hereby agrees that it will pay
to the Owner Trustee, on the payment date specified in such notice, as
liquidated damages for loss of a bargain, and not as a penalty, and in lieu of
any further payments of Basic Hire hereunder, an amount (reduced by any amounts
previously paid by the Charterer pursuant to Section 16(d)) equal to the sum of
(i) all unpaid Basic Hire payable or that would have been payable on or
before the Hire Payment Date next succeeding the date of payment specified in
such notice, plus (ii) an amount equal to Stipulated Loss Value calculated
as of such Hire Payment Date, unless such payment date shall occur on a Hire
Payment Date, in which case Stipulated Loss Value and unpaid Basic Hire shall
be computed as of such Hire Payment Date, together with interest, if any, at
the Overdue Rate on the amount of such Stipulated Loss Value and Basic Hire
from the Hire Payment Date as of which Stipulated Loss Value is computed until
the date of actual payment; and upon such payment of liquidated damages and all
other Hire then due and payable by the Charterer the Owner Trustee shall
transfer (without any representation, recourse or warranty whatsoever other
than the absence of Owner=s Liens) the Vessel to the Charterer and the Owner
Trustee shall execute and deliver such documents evidencing such transfer and
take such further action as the Charterer shall reasonably request.  In
addition, the Owner Trustee may, within 30 days after the Charterer shall make
the full payment of Basic Hire and Stipulated Loss Value as aforesaid, give the
Charterer written notice requesting that the Fair Market Sales Value of the
Vessel as of the date as of which Stipulated Loss Value was determined pursuant
to clause (ii) of this Section 16(b) be determined.  If the Fair Market Sales
Value of the Vessel as of such date shall be determined to exceed the
Stipulated Loss Value paid pursuant to the first sentence of 16(b), the
Charterer shall, within 60 days after such determination, pay the amount of
such excess to the Owner Trustee.

. . .

(d)       Whether or not the
Owner Trustee shall have exercised, or shall thereafter at any time exercise,
any of its rights under Section 16(c) (other than a sale under Section 16(c)),
the Owner Trustee may, at any time prior to the time that the Vessel shall have
been transferred to the Charterer pursuant to Section 16(b) or sold by the
Owner Trustee pursuant to Section 16(c), by written notice to the Charterer
requesting that the Fair Market Sales Value or Fair Market Rental Value of the
Vessel be determined, demand that the Charterer shall pay to the Owner Trustee,
and the Charterer shall pay to the Owner Trustee on the first Hire Payment Date
occurring at least ten days after the determination of such Fair Market Sales
Value or Fair Market Rental Value, as the case may be, as liquidated damages
for loss of a bargain and not as a penalty (in lieu of all payments of Basic
Hire becoming due after the payment date), an amount equal to the sum of
(i) all unpaid Basic Hire due on or before such Hire Payment Date and
(ii) whichever of the following amounts the Owner Trustee, in its sole
discretion, shall specify in such notice (together with interest on such amount
at the Overdue Rate from the scheduled payment date to the date of actual
payment): (x) [sic] an amount equal to the excess, if any, of the
Stipulated Loss Value, computed as of such Hire Payment Date, over the Fair
Market Rental Value of the Vessel for the remainder of the Basic Term or the
then[-]current Renewal Term, as the case may be, after discounting such Fair
Market Rental Value semi-annually (effective on the Hire Payment Dates) to
present worth as of the scheduled payment date at the rate of interest borne by
the Bonds at the time outstanding or if none shall be outstanding, the Prime
Rate, or (y) [sic] an amount equal to the excess, if any, of the
Stipulated Loss Value for the Vessel as of such Hire Payment Date over the Fair
Market Sales Value of the Vessel.








All determinations of Fair
Market Sales Value and Fair Market Rental Value pursuant to this Section 16
shall be determined in accordance with the Appraisal Procedure.  No termination
of this Charter, in whole or in part, or exercise of any remedy under this
Section 16 shall, except as specifically provided herein, relieve the Charterer
of any of its liabilities and obligations hereunder, all of which shall survive
such termination, repossession or exercise or remedy.  In addition, the
Charterer shall be liable for any and all unpaid Supplemental Hire due
hereunder (and all other amounts payable by Charterer under the Participation
Agreement) before, after or during the exercise of any of the foregoing
remedies, including all reasonable legal fees and other costs and expenses
incurred by the Owner Trustee . . . by reason of the
occurrence of any Charter Event of Default or the exercise of the remedies of
the Owner Trustee with respect thereto . . . .

To the extent permitted by,
and subject to the mandatory requirements of all Applicable Laws, each and
every right, power and remedy herein specifically given to the Owner Trustee or
otherwise in this Charter shall be cumulative and shall be in addition to every
other right, power and remedy herein specifically given or now or hereafter
existing at law, in admiralty, in equity or by statute, and each and every
right, power and remedy whether specifically given herein or otherwise existing
may be exercised from time to time and as often and in such order as may be
deemed expedient by the Owner Trustee, and the exercise or the beginning of the
exercise of any power or remedy shall not be construed to be a waiver of the
right to exercise at the same time or thereafter any other right, power or
remedy.  No delay or omission by the Owner Trustee in the exercise of any
right, power or remedy or in the pursuit of any remedy shall impair any such
right, power or remedy or be construed to be a waiver of any default on the
part of the Charterer or to be an acquiescence therein.  No express or implied
waiver by the Owner Trustee of any Event of Default shall in any way be, or be
construed to be, a waiver of any future or subsequent Charter Event of
Default. . . . 

. . .








SECTION 18 Renewal Options. 
(a) Fixed Rental Renewal Option.  Unless the Charterer shall have
elected to purchase the Vessel under Section 19, and unless a Charter Default
shall have occurred and then be continuing, the Charterer may, by irrevocable
written notice to the Owner Trustee given not less than twelve months nor more
than 18 months prior to the scheduled expiration of the Basic Term, renew this
Charter at the expiration of the Basic Term.  Such Renewal Term shall be for a
period that, when added to the Interim Term and the Basic Term, shall not
exceed 80% of the total estimated remaining economic useful life of the Vessel
(measured from the Closing Date) as determined by the Appraisal Procedure and
in no case shall exceed 7-1/2 years; provided, however, that (A)
at the end of such Renewal Term the Vessel will have an estimated residual
value (in 1984 dollars without giving effect to inflation or deflation from the
beginning of the Charter Term) as determined in such Appraisal Procedure of not
less than 20% of the Owner=s Cost for the
Vessel and (B) the use of the Vessel will, as of the beginning of such Renewal
Term and as determined in such Appraisal Procedure, be reasonably expected to
be commercially feasible (in a manner that would permit the Owner Trustee to
realize the residual value described in the foregoing clause (A)) by some
Person other than the Charterer (or any party related to the Charterer) who
could charter or purchase the Vessel from the Owner Trustee at the end of such
Renewal Term.  In addition to the limitation set forth in the next preceding
sentence, no Renewal Term pursuant to this paragraph (a) shall be entered into
if it would end before one year after the commencement thereof.  During such
Renewal Term, all of the provisions of this Charter shall continue in full
force and effect, except that (i) Basic Hire shall be payable
semiannually in arrears in an amount equal to 50% of the weighted average
amount of the semiannual installments of Basic Hire payable during the Basic
Term and (ii) Stipulated Loss Value on each Hire Payment Date during such
Renewal Term shall be equal to the sum of Basic Hire payable on such Date and
the present value as of such Date of (a) Basic Hire that would have been
payable over the balance of such Renewal Term and (b) the estimated
residual value as of the end of such Renewal Term (present value to be
determined by using a discount rate of 10% compounded semiannually) as
determined by the Appraisal Procedure.

 

SECTION 27.  Miscellaneous.  (f) Governing Law.  This
Charter shall in all respects be governed by, and construed in accordance with,
the general maritime laws of the United States of America and otherwise by the
laws of the State of New York.









[1]  Various bond purchasers and an indenture trustee
were also parties to the Participation Agreement but are not parties to the
underlying suit or to this appeal.





[2]  This figure was to be calculated Awithout taking into account the effects of inflation
or deflation and costs of removal@ to
Textron or Wilmington.  In addition, the appraiser was to opine that the
Halifax does not constitute Alimited use
property@ as that term is used in Rev. Proc. 76-30. 





[3]  Note that this estimate does not say Aat least twenty percent.@





[4]  Textron subsequently assigned its beneficial
interest in the Participation Agreement and the Charter to its subsidiary,
North Sea Investments Inc.  Rowan later agreed to North Sea Investments Inc.=s substitution as Owner Participant through an
Assumption and Assignment of Participation Agreement.  On July 31, 2006, North
Sea (Connecticut) LP intervened in the suit, alleging that it Aowns a right to share in the economic benefits owed to
North Sea by Rowan . . . .@  We therefore
include North Sea Investments and North Sea (Connecticut) LP in our use of the
name, ATextron.@





[5]  Under the terms of the escrow agreement, this amount
was to be paid by the escrow agent on March 15, 2006.  The record is not clear
regarding the date on which this occurred. 





[6]  Five days after the date of Wilmington=s letter, Rowan filed a first amended original
petition for damages and declaratory relief, adding Textron subsidiary CP
Offshore LLC as a defendant and adding claims concerning the Cecil Provine
rig.  Rowan alleged that, just as North Sea succeeded to Textron=s interest in the Rowan-Halifax rig, CP succeeded to
Textron=s interest in the Cecil Provine rig.  Rowan also added
a claim in quantum meruit for insurance premiums it incurred to insure the
Cecil Provine for its full market value, rather than its Stipulated Loss
Value.  





[7]  This figure represents the sum of the Basic Hire
payment and its calculation of the Stipulated Loss Value,  reduced by the
amount that Rowan already had paid based on its own calculations.





[8]  In addition, Textron, North Sea, and Wilmington
asked the trial court to dismiss Rowan=s
claim for increased insurance premiums on a second rig, the Cecil Provine,
which was subject to a similar sale and leaseback agreement.  Claims regarding
the Cecil Provine were severed from the case.





[9]  Before ruling on the cross-motions for summary
judgment, the trial court signed two severance orders.  By agreement of the
parties, the trial court severed Rowan=s
quantum meruit claims against the Owners.  In addition, the trial court granted
the Owners= motion to sever their claims against Rowan for
(1) breach of contract for failure to pay expenses for the Halifax
Appraisal Procedure; (2) breach of contract for failure to indemnify the
Owners for the loss of the Halifax; (3) relief sought pursuant to section
16(b) of the Halifax Charter; (4) a declaration of the Owners= right to remedies under section 16(b) of the Halifax
Charter; (5) a declaration of the Owners= rights regarding Rowan=s continuing
obligation to insure the Cecil Provine rig, including the Owners= rights under sections 9(a) and 12(b)(ii) of the Cecil
Provine Charter; (6) a declaration of the Owners= continuing right to have the Stipulated Loss Value
for the Cecil Provine decided by the Appraisal Procedure; and (7) all
relief requested in the Owners= pleadings
relating to such claims, including requests for damages, interest, and
attorneys= fees.  The latter order was Aintended to sever and
consolidate . . . all claims and issues not decided with
respect to the motions for summary judgment filed by the parties in this
action.@





[10]  164 S.W.3d 656, 661 (Tex. 2005).





[11]  Restatement
(Second) of Contracts: Rules in Aid of Interpretation ' 202(2) (1979). 





[12]  See, e.g., Tetra Applied Techs., LP v.
Henry=s Marine Serv.,
No. H-04-2576, 2007 WL 1239240, at *2 (S.D. Tex. April 27, 2007).





[13]  We note, however, that if a party asks the court to
take judicial notice of the laws of another state, the court must do so if the
party provides the court with Asufficient
information to enable it properly to comply with the request.@  Tex. R. Evid.
202.  AA preliminary motion is necessary to assure the
application of the law of another jurisdiction, and absent a motion by a party,
Texas law may be applied to a dispute.@  Burlington
N. & Santa Fe Ry. Co. v. Gunderson, Inc., 235 S.W.3d 287, 290 (Tex.
App.CFort Worth 2007, pet. withdrawn) (citing Pittsburgh
Corning Corp. v. Walters, 1 S.W.3d 759, 769 (Tex. App.CCorpus Christi 1999, pet. denied)).





[14]  Although Rowan argued in the trial court that Basic
Hire was not a component of Stipulated Loss Value, it has abandoned that
argument on appeal.





[15]  AScrap value@ is defined as A[t]he
value of the constituent materials and components of a thing; not its value for
the purpose for which it was made.@  Id.





[16]   See also Taracorp, Inc. v. NL Indus., Inc.,
73 F.3d 738, 744 (7th Cir. 1996) (applying general principles of contract law
and inferring that parties did not intend for two different phrases to mean the
same thing); Hubbell v. United States, 4 Ct. Cl. 37, 1800 WL 608, at *3
(Cl. Ct. 1868) (ANeither Congresses nor men are apt to say precisely
the same thing over twice in different words . . . .@).





[17]  Barnhart v. Thomas, 540 U.S. 20, 26 (2003).





[18]  In their motion for rehearing, the Owners argue that
Rowan did not contend the rule of the last antecedent applies.  As a
grammatical rule, however, it applies to the contract regardless of whether the
parties point it out. Interpretation of a maritime contract is a matter of law,
reviewable de novo on appeal.  Foreman v. Exxon Corp. 770 F.2d 490, 496
(5th Cir. 1985).  General federal maritime law has adopted the general rules of
contract construction, which include rules of grammar.  See F.T.C. v. Mandel
Bros., Inc., 359 U.S. 385, 389B90,
79 S. Ct. 818, 822B23 (1959) (applying the rule of the last antecedent
without suggesting that its application was urged by any party); Sims= Lessee v. Irvine, 3 U.S. 425, 445 n.a, 1 L. Ed. 665 (1799) (AThe rule is, that >such= applies to the last antecedent, unless the sense of
the passage requires a different construction.@ (quoting Ellsworth, C.I.)).  The rules of English grammar also apply
under New York contract law.  See In re Enron Creditors Recovery Corp., 
380 B.R. 307, 322 (S.D.N.Y. 2008) (AUnder
ordinary contract construction rules, the rules of English grammar apply.  The
rule of the last antecedent is such a rule.@); id.
at 319 (A[I]n line with the maxim that contract language is to
be interpreted pursuant to the plain, ordinary and usual meaning of the words
used, . . . a court should apply settled rules of grammatical construction
unless it clearly appears that the parties intended otherwise.@) (citation omitted).  The Owners also contend that if
we apply the rule of the last antecedent as we have done here, we must also
apply it to the parenthetical in section 3.01(j)(ii).  This premise, however,
is incorrect.  See R.W.
Burchfield, The New Fowler=s Modern English Usage, 571 (rev. 3d ed., Oxford Univ. Press 2000)
(describing a parenthesis as an Ainterruption@ of a sentence and stating, AIt is important to bear in mind that a parenthesis may
or may not have a grammatical relation to the sentence in which it is inserted.@).





[19]  One appraiser noted that Rowan Companies lost four
offshore rigs as a result of Hurricanes Katrina and Rita.  Another notes that Aday rates at this time have increased dramatically
over a short period of time.@  According to
the appraiser, such rates were Aapproximately
twice as high now compared to late 2002,@
which was the last time prior to the loss that a comparable rig was sold, and Athe [fair market value] derived from the Cost Approach
is not appropriate given the high day rates presently in the marketplace.@  He further stated that A[t]here are presently 43 jackups on order that will be
delivered in the next three years@
and Aday rates will be moderate in 3 to 4 years as supply
catches up with demand.@  The surveyor from ABS Consulting observed, ANaturally, if equipment is in high demand, the dayrate
or earning capacity of any such unit is increased and this tends to have a
proportionate increasing effect on value[,]@
and, Aamong drillers, the tightest supply now is for jackup
rigs such as the [Halifax].@  AJackup rig utilization has increased from 86% in April
2004 to effectively 100% as of the date of this report [2/22/06].  Also, rig
charter dayrates have doubled in some regions since the third quarter of 2004
due to tight supply.@  The third appraiser stated, AIt is obvious that we are currently in an extremely
strong market, a seller=s market.@ 
The ABS surveyor further observed that as of February 2006, rig demand exceeded
supply.





[20]  Because Rowan was required to repair damage costing
as much as half of the estimated residual value, substituting a hypothetical
fair market value for estimated residual value also skews Rowan=s repair obligations: as the fair market value
increases, the relative cost of repair decreases.  Thus, if the Halifax
survived with some damage, and we followed the Owners= suggestion of substituting fair market value for
estimated residual value, then Rowan=s
maximum responsibility for repair costs would increase from approximately $6.65
million to more than $40 millionCbased
upon damage sustained by other vessels.





[21]  See Lechuga v. Tex. Employers= Ins. Ass=n, 791 S.W.2d 182, 185 (Tex.
App.CAmarillo 1990, writ denied) (explaining the ordinarily
understood meaning of the word, Asuch@); Coker v. Tex. Alcoholic Beverage Comm=n, 524
S.W.2d 570, 574B75 (Tex. Civ. App.CDallas
1975, writ ref=d n.r.e.) (holding that the word Asuch@ refers back to
preceding language; thus, in a statute that initially identifies Adry@ political
subdivisions, a subsequent reference to Asuch@ political subdivisions refers to those same
identified subdivisions); Warner Elevator Mfg. Co. v. Houston, 28 S.W.
405, 408 (Tex. Civ. App. 1894) (A>Such= refers to what has been specified, and means >the same as has been mentioned.=@), rev=d on other grounds, 88 Tex.
489, 31 S.W. 353 (1895). 





[22]  See Ch. 7.  The Future Tenses, WordPower, (2002-2009),
http://www.wordpower.ws/grammar/gramch07.html; H. Ramsey Fowler, The
Little, Brown Handbook, 155 (Little, Brown & Co. eds. 1980) (AThe perfect tenses indicate that an action was
or will be completed before another time or action.@); see, e.g., In re Eagle-Picher Indus.,
Inc., 190 B.R. 557, 562 (Bankr. S.D. Ohio 1995) (discussing lease provision
agreeing that ALandlord shall have the right, but not the obligation,
to terminate this Lease . . . if by August 31, 1989
Landlord shall have been unable to obtain a commitment for both a non-recourse
construction loan and a non-recourse permanent loan@); Stabile v. McCarthy, 336 Mass. 399, 403, 145
N.E.2d 821, 823B24 (1957) (holding that contract that was Asubject to the right of the buyer in the event that he
shall have been unable to obtain the approval of the Wilmington Planning Board
of his proposed subdivision of the . . . premises prior to
the date . . . set for performance . . . at
his option to cancel this agreement@
required the buyer to prepare a plan conforming to the planning board
regulations, and to try reasonably to obtain planning board approval prior to
the date set for the conveyance, before condition precedent for contract
cancellation was satisfied); Wilmington United Neighborhoods v. U.S. Dep=t of Health, Educ.& Welfare, 458 F. Supp. 628, 645 (D.C. Del. 1978) (discussing
contract providing that A[i]If on July 1, 1978, litigation pending against
Owner . . . shall remain pending or shall have been
resolved adversely to Owner, or if prior to such date Owner shall have been
unable to obtain or obtain commitments for such financing then from and after
July 1, 1978, Owner shall have the right to terminate the Contract by the
giving of seven days prior written notice@).





[23]  In addition, the rig arguably had already been
appraised by Aa mutually acceptable qualified independent appraiser@ in 1984 pursuant to section 3.01(j) of the
Participation Agreement.  As a signatory to the contract, Rowan accepted Rush
Johnson Associates as the marine surveying company to provide the Appraiser=s Certificate.  Thus, the December 1, 1984 contract
can itself be considered Awritten notice to the other requesting determination
of such amount, value or period by appraisal,@ and Athe Owner Trustee and the Charterer@ did appoint Aa
mutually acceptable qualified independent appraiser, who shall be a marine
surveyor.@  This appraisal is Afinal and binding.@ If the initial
agreed use of Rush Johnson Associates is the first use of the Appraisal
Procedure, and the Owner is permitted to invoke the Appraisal Procedure again,
then the contract language requiring the result of the appraisal procedure to
be Afinal and binding@ is
rendered meaningless. 





[24]  Under New York law, A[a]n >ambiguous=
word or phrase is one capable of more than one meaning when viewed objectively
by a reasonably intelligent person who has examined the context of the entire
integrated agreement and who is cognizant of the customs, practices, usages and
terminology as generally understood in the particular trade or business.@  Walk‑In Med. Ctrs., Inc. v. Breuer Capital
Corp., 818 F.2d 260, 263 (2d Cir. 1987) (quoting Eskimo Pie Corp. v.
Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)).

 

 

 





[25]  We note also that, in a leveraged lease, the lessee
does not guarantee the residual value of the property.  FASB 13.  This is not
simply a matter of accounting, but has a real effect on the terms of the
agreement that are consistent with its purpose of establishing a leveraged
lease.





[26]  In their motion for rehearing, the Owners argue that
A>[b]y delaying the implementation of the appraisal
procedure, both parties took the risk that the property would change in value
by the time the appraisal finally took place.=@  De Anza Enters. v. Johnson, 128 Cal. Rptr. 2d 749, 757 (Cal.
Ct. App. 2002).  The Owners further contend that ATexas public policy requires the De Anza approach here to
effectuate the parties= agreement to resolve their dispute via the Appraisal
Procedure.@  We note that the contract at issue here, however, is
governed by general federal maritime law, whereas De Anza is a
California state law case using California statutes governing contract
interpretation.  Those statutes differ from the general federal maritime law
that govern this action.  Moreover, De Anza supports the position that
by delaying implementation of the appraisal procedure, the Owners took the risk
that the rig would be valueless at the time of the appraisal.





[27]  Pursuant to Charter section 12, Rowan sought an
award of excess insurance proceeds, but the Owners did not seek judgment on
this basis.  To the contrary, in their motion for summary judgment, they argued
as follows:

With respect to the Halifax, of course, there are no Aexcess@ insurance
proceeds subject to Charter ' 12(b)(ii)
because Rowan=s payment obligation under ' 12(a) far exceeded the amount of insurance
proceeds received.  The owners ask the Court to declare that the Owner Trustee
is entitled to all of the Halifax insurance proceeds, pursuant to
Charter ' 12(b)(i).

The Owners argue that, on
remand, it is appropriate to consider the Owners= claim that Rowan breached the contract by failing to maintain adequate
insurance.  We disagree.  In its motion for summary judgment, the Owners asked
that the trial court declare Athat
Rowan was obligated to maintain hull insurance on the
Halifax . . . in an amount sufficient to pay the full value
of Defendants= ownership interest . . . .@  With regard to the Halifax, the Owners did not move
for damages on this basis.  As previously noted, however, the trial court
severed a number of claims regarding the Halifax from the case before us,
including, inter alia, the Owners=
claims for (1) failure to indemnify the Owners for the Halifax=s loss, (2) relief pursuant to pursuant to section
16(b) of the Charter; (3) a declaration of the Owners= right to remedies under section 16(b) of the Charter;
and (4) all relief requested in the Owners= pleadings relating to such claims.  See ante, n.9 (emphasis added).  Section
16(b) of the Charter sets forth the contractual remedies available should an AEvent of Default@
occur, and the Charter specifically defines the failure to maintain insurance
in compliance with the Charter as an Event of Default.  Thus, the Owners= request for a declaration that they are entitled to
the remedies under section 16(b) of the Charter is, in effect, a request that
the trial court declare whether an Event of Default occurred.  Because we read
this request for relief to be encompassed in the trial court=s reference to  Arelief
requested in the Owners= pleadings relating to@ the severed claims described above, we consider the Owners= request for declaratory judgment to be severed as
well.  Thus, remand for litigation of the claim in the present cause number is
unnecessary.





[28]  In section 3.01(j) of the Participation Agreement,
it is similarly stated that it is a condition precedent which must be fulfilled
or waived that, as of the Closing Date, the Owner Participant shall have
received appraisals by Rush Johnson Associates and Lowell Johnston &
Associates, Inc., A(i) such appraiser=s
estimate of the fair market value of the Vessel on the Closing Date,
which . . . shall be equal to $66,500,000; (ii) such
appraiser=s estimate as of the Closing date of the remaining
useful life of the Vessel and the residual value thereof at the end of the
Basic Term . . . , which estimates shall be not less than
22 years and not less than 20% of Owner=s
Cost for the Vessel, respectively . . . .@ 





[29]  Section 8.08 concerns changes in tax law.  Under
Section 9.01, adjustments are also required if Transaction Costs are greater or
less than 0.75% of Owner=s Costs or the Closing Date is other than December 28,
1984.  The occurrence of a loss is not included among the events requiring such
adjustment.





[30]  The Closing Date is defined to mean December 28,
1984. 





[31]  The Participation Agreement names AThe Connecticut Bank and Trust Company, National
Association@ as Indenture Trustee.  Rowan Companies, Inc. is named
as Charterer, and the remaining originally-named parties to the Participation
Agreement are six Bond Purchasers.





[32]  At the summary judgment hearing, Rowan=s attorney emphasized the word, Aapplicable@:

Mr. Beck:          It
doesn=t say under any insurance.  It says Athe applicable[.]@
They knew what the applicable insurance policy was.  They knew it was an agreed
value policy.  They knew that it was not a co-insurance situation.  And over 16
years of the basic term they never complained about any of
this. . . . They didn=t
complain about any of that and now they=re
coming in after the fact, we respectfully submit, and say, no, that=s not really the procedure you should have been
following.

He later explained that this
shows the dealings and course of conduct of the parties.  Rowan=s attorney also asserted that the Owner Trustee
purchased Agap insurance@
for the difference between the Aagreed value@ coverage Rowan bought and the Owner Trustee=s claimed interest.  The trial court pointed out that
section 9(a) requires Rowan to insure Athe
greater of@ SLV or an amount necessary to prevent any party (the
Charterer, Owner Trustee, etc.) from being a coinsurer.  In response, Rowan=s attorney insisted that Ayou cannot ignore the language under the applicable
insurance policies.@  The trial court also pointed out that the charter
does not say that Rowan has an obligation to maintain agreed value insurance,
and Rowan=s counsel answered, ANo, but it=s in the certificate that tells them the type of all
risk hull insurance that we bought.  And it tells them specifically what the
amount is.  Our position was consistently throughout the 16-year term of the
charter that that was the amount of the policy 9(a) required us to get.  And
nobody ever complained about that.@ 
But Textron says that Jane M. Lavoie=s
letter of August 15, 2005 to Rowan=s
treasurer and vice-president of finance is evidence that they did question
the adequacy of the insurance.